**Joseph DARLAK, M.D.,**
**Plaintiff-Appellant,**

v.

**John B. BOBEAR, M.D. and/or Elliot Roberts, Jr. and/or Sandra L. Robinson, M.D., and/or Charity Hospital of Louisiana at New Orleans, and/or Department of Health and Human Resources, and/or William Barkman, M.D., and/or Barbara Hanna, M.D., Defendants-Appellees.**

No. 86–3430.

United States Court of Appeals,
Fifth Circuit.

April 20, 1987.

Rehearing Denied May 18, 1987.

Patrick D. Breeden, New Orleans, La., for plaintiff-appellant.

Eavelyn T. Brooks, Arthur J. Finn, Ass't. Attys. Gen., William J. Guste, Jr., Atty. Gen., New Orleans, La., for defendants-appellees.

Before REAVLEY and RANDALL, Circuit Judges, and MAHON,* District Judge.

RANDALL, Circuit Judge:

Joseph Darlak appeals the district court's grant of the defendants' motions for summary judgment, for dismissal for failure to state a claim upon which relief could be granted, and for dismissal for lack of subject-matter jurisdiction. We affirm.

## I. Factual Background

Joseph Darlak, M.D., was an associate professor of radiology at the Louisiana

---

* District Judge of the Northern District of Texas, sitting by designation.

State Medical School and a member of the visiting staff at Charity Hospital of Louisiana at New Orleans ("Charity"). Charity Hospital is a part of the Louisiana Department of Health and Human Resources ("DHHR"). *See* La.Rev.Stat.Ann. § 36:251(c) (West 1985).

On December 7, 1984, Dr. Darlak performed a CT-guided biopsy procedure on Abraham Brown, a patient at Charity. The patient's primary care physicians were Drs. Juan Lastra and Mary Moore Abel, two resident physicians at Charity. On December 11, 1984, Drs. H. William Barkman and Barbara Hanna, two assistant professors of medicine at Tulane Medical Center, wrote a letter to Dr. John Bobear, the medical director of Charity, stating that Dr. Darlak performed the biopsy procedure without verbal or written confirmation and against the wishes of the primary care team and failed to provide adequate guidance and follow-up instructions for the patient's care.[1] On December 17, 1984, Dr. Bobear contacted the primary care physicians, who corroborated the allegations of Dr. Barkman and Dr. Hanna.

On December 18, 1984, Dr. Bobear and Dr. George Meckstroth, the director of professional support services at Charity, met with Dr. Darlak to discuss the allegations contained in the letter of December 17. Based upon this meeting, Dr. Bobear, by letter of December 18, 1984, temporarily suspended Dr. Darlak from hospital privileges at Charity, pending the outcome of a full investigation and a hearing before Charity's Credentials Committee. Dr. Bobear relied upon hospital regulations for the authority to temporarily suspend Dr. Darlak.[2]

The Credentials Committee met on January 8, 1985. Evidence was taken at this hearing, and Dr. Darlak was permitted to make a statement. After considering the evidence and the statement of Dr. Darlak, the Committee recommended that Dr. Darlak's privileges at Charity be suspended for two months, effective December 18, 1984, the date that Dr. Darlak was temporarily suspended. The Committee's recommendations were adopted and, by a letter signed by Elliot C. Roberts, the director of Charity, and dated January 10, 1985, Dr. Darlak was suspended from the medical staff at Charity for a period of two months. On January 28, 1985, Dr. Darlak was informed of his right to appeal the suspension decision. On the same date, Dr. Darlak indicated by letter his intent to appeal, and a hearing was scheduled for February 21, 1985. Settlement negotiations ensued, and the appeal date was continued. When no agreement could be reached, Dr. Darlak was notified on October 2, 1985, that appeal proceedings should be reinstated. Dr. Darlak did not seek further appeal.

Instead, Dr. Darlak filed this action on December 5, 1985, under 42 U.S.C. § 1983, claiming that the defendants, under color of state law, had violated his right to procedural and substantive due process of law and to the equal protection of the laws. Dr. Darlak also alleged pendent state law claims sounding in negligence and unfair trade practices. Dr. Darlak sought actual damages of $500,000, punitive damages of $2 million, and an injunction forcing the defendants to void his suspension. Dr. Darlak named the following persons and entities as defendants: (1) DHHR; (2) Charity; (3) Dr. Bobear, the medical director of Charity; (4) Dr. Sandra L. Robinson, the Secretary of DHHR; (5) Elliot Roberts, Jr., the director of Charity; (6) Dr. Barkman; and (7) Dr. Hanna. The individ-

---

1. Dr. Darlak disputes that he performed the biopsy without the consent of the primary care physicians, and claims that Dr. Monish K. Sarcar, a resident physician at Charity, received a verbal request to perform the procedure. Dr. Darlak claims that both Dr. Bobear and the Credentials Committee failed to investigate this claim or otherwise speak to Dr. Sarcar.

2. The regulations provide:

The Medical Director shall have the authority to temporarily suspend any staff member or house officer where substantive allegations exist of professional misconduct or unethical professional behavior. This suspension shall be effective while awaiting investigation and recommendations from the Credentials Committee within 30 days of the infraction.

By-laws—Rules and Regulations of the Medical Staff of Charity Hospital at New Orleans, Art. IV, § 6(3).

ual defendants were sued in both their individual and official capacities.

On January 17, 1986, DHHR, Charity, Dr. Robinson, and Elliot Roberts moved to dismiss Dr. Darlak's complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(2) as to DHHR, Charity, and Robinson and Roberts in their official capacities, and for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) as to Robinson and Roberts in their individual capacities. On February 10, 1986, Drs. Bobear and Barkman moved for summary judgment under Federal Rule of Civil Procedure 56, claiming that there were no disputed facts and that as a matter of law Dr. Darlak had received all the process that was due him.

On March 11, 1986, the district court granted these motions. The district court held that the eleventh amendment barred suit against DHHR and Charity. The district court noted that a suit alleging the unconstitutionality of a state official's conduct is not barred by the eleventh amendment, but held that since neither Roberts nor Robinson acted unconstitutionally, the eleventh amendment precluded suit against them. The district court did not discuss its reasons for granting summary judgment in favor of Drs. Bobear and Barkman, but since the district court found no violation of Dr. Darlak's due process rights, the district court probably concluded that these defendants were entitled to judgment as a matter of law. Finally, the district court held that there was no duty on the part of the Credentials Committee to interview Dr. Sarcar, and that the suspension of Dr. Darlak's staff privileges was not an unfair trade practice under Louisiana law. Hence, the only remaining defendant was Dr. Hanna.

On April 11, 1986, Dr. Hanna moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court, treating Dr. Hanna's motion as one for summary judgment, granted the motion, stating that the motion was being granted for the same reason that Dr. Barkman's motion was granted. In the same minute entry, the district court dismissed without prejudice Dr. Darlak's pendent state law negligence claims against all of the defendants. On May 28, 1986, the district court entered judgment in favor of all defendants and dismissed Dr. Darlak's complaint. On June 3, 1986, Dr. Darlak filed a timely notice of appeal to this court.

On appeal, Dr. Darlak argues that the district court erred in dismissing his complaint on eleventh amendment grounds. He contends that the federal courts have jurisdiction to declare that the hospital regulation that he was initially suspended under is unconstitutional. On appeal, he apparently has given up his claims for damages, and asserts that a federal court can at least grant him prospective injunctive relief forcing the defendants to void his suspension *ab initio*, despite the bar of the eleventh amendment.

In addressing Dr. Darlak's arguments, we will first consider whether and to what extent the eleventh amendment constitutes a bar to suit against the various defendants. In order to make this determination, we will review the general principles of eleventh amendment constitutional law and will analyze separately the eleventh amendment defenses of the state entities and the state officials. Based upon the above analysis, we will determine which of the defendants the district court properly dismissed on eleventh amendment grounds. After deciding the eleventh amendment issue, we will consider the issue of whether the temporary suspension of Dr. Darlak comported with due process of law. In making this determination, we will consider the United States Supreme Court's latest teaching on this subject: *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). We turn now to our consideration of the eleventh amendment.

## II. The Eleventh Amendment—State Entities

The principles of the eleventh amendment[3] relevant to this case are well settled:

> The Eleventh Amendment to the United States Constitution bars suits in federal court by citizens of a state against their own state or a state agency or department. Claims under federal statutes do not override the Eleventh Amendment bar unless there is a clear showing of congressional intent to abrogate the bar. Section 1983 does not override the Eleventh Amendment bar.

*Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 185–86 (5th Cir.1986). Eleventh amendment analysis differs depending upon whether the defendant is a state entity or a state official. "The Eleventh Amendment bars suits against a state entity, as opposed to a state official, regardless whether money damages or injunctive relief is sought." *Id.* at 186.

In determining whether a particular entity enjoys eleventh amendment immunity, this court engages in an analysis based upon six factors.

> The relevant factors include: (1) whether state statutes and case law characterize the agency as an arm of the state; (2) the source of funds for the entity; (3) the degree of local autonomy the entity enjoys; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.

*Minton v. St. Bernard Parish School Bd.,* 803 F.2d 129, 131 (5th Cir.1986) (footnote omitted). Applying these factors to the case *sub judice* convinces us that DHHR and Charity are alter egos of the state and are therefore entitled to eleventh amendment immunity.

The first factor, whether state statutes and case law characterize the entity as an arm of the state, points toward eleventh amendment immunity for both DHHR and Charity. Louisiana statutory and decisional law characterize DHHR as an arm of the state. *See* La.Rev.Stat.Ann. § 36:251(A) (West 1985) (creating DHHR as part of the executive department); *id.* § 36:251(C) (office of Charity Hospital a part of DHHR); *Wright v. Moore,* 380 So.2d 172, 173 (La. App. 1st Cir.1979) (holding that the state of Louisiana was the real party in interest in a suit against one of its executive departments).

The second factor, the source of funds for the agency, also points to a finding of eleventh amendment immunity for both DHHR and Charity. As executive departments, DHHR and Charity receive their funding from the State of Louisiana. Furthermore, and of critical importance to our eleventh amendment analysis,[4] any judgment against either DHHR or Charity would be paid from state funds appropriated for that purpose. *See* La. Const. art. 12 § 10(C) (no judgment against a state entity is payable except from funds appropriated therefor by the legislature); *Pettis v. State,* 336 So.2d 521 (La.App. 3d Cir.1976) (state liable for damages in medical malpractice suit against state hospital).

The third factor in our analysis, the degree of local autonomy that the agency enjoys, also points to a finding of immunity on the part of both DHHR and Charity. The Secretary of DHHR is under the control and supervision of the governor, and serves at the pleasure of the governor. La.Rev.Stat.Ann. § 36:253 (West 1985). Charity is under the supervision of an assistant secretary, who is also appointed by the governor with the advice and consent of the state senate, and who serves at the pleasure of the governor. *Id.* § 36:257. Hence, far from being autonomous entities, DHHR and Charity are under the direct

---

**3.** The eleventh amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

**4.** *Cf. Wheeler v. Mental Health & Mental Retardation Auth.,* 752 F.2d 1063, 1073 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985) (noting in dicta that a state agency is protected by the Eleventh Amendment if payment of the judgment would be made directly from the state treasury).

control of the executive branch of state government.

The fourth factor in our analysis, whether the entity in question is concerned with local or statewide problems, points in different directions for DHHR on the one hand, and Charity on the other. DHHR is clearly concerned with statewide health problems. *Id.* § 36:251. Charity, however, is concerned only with the administration of the hospital, which is one factor against a finding of immunity in its case. *See id.* § 36:258(F).

The fifth and sixth factors, whether the entity has the right to sue and be sued in its own name and whether the entity has the right to hold property, point toward a finding of no eleventh amendment immunity. DHHR, as well as all other executive departments of Louisiana, has the capacity to sue and be sued in its own name, *id.* § 36:251(A), and has the authority to hold and use property. *See Louisiana Ass'n for Mental Health v. Edwards*, 322 So.2d 761, 767 (La.1975) (construing powers of Louisiana Health and Human Resources Administration—the predecessor agency to DHHR). Similarly, Charity Hospital may sue and be sued in state court, and the board of administrators of Charity has broad powers to dispose of property owned by Charity. *See* La.Rev.Stat.Ann. § 46:759, 46:773–:774 (West 1982). We note, however, that this court has not found these factors to be controlling when the other factors considered above point to a finding of eleventh amendment immunity. *See Voisin's Oyster House*, 799 F.2d at 187.

With the exception of the final two factors, therefore, our analysis points strongly to a finding of eleventh amendment immunity for DHHR and Charity. Hence, based upon the above analysis, we hold that both DHHR and Charity are the alter egos of the State of Louisiana, and that therefore suit against them, whether for damages or injunctive relief, is barred by the eleventh amendment.[5]

## III. The Eleventh Amendment—State Officials

[2] The analysis of eleventh amendment immunity in the case of state officials differs from that applicable to state entities.[6] The Supreme Court has recently summarized the law on this subject. The Court stated:

When a suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself.... The Eleventh Amendment bars a suit against state officials when "the state is the real, substantial party in interest." Thus, "[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief.

The Court has recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State. This was the holding in *Ex*

---

5. We note that our decision that DHHR is an arm of the state and is therefore protected by the eleventh amendment is supported by the conclusion reached by those federal district courts in Louisiana that have considered the issue. *See, e.g., Claiborne v. Director, Department of Health & Human Resources*, 630 F.Supp. 156, 158 (M.D.La.1986); *Kurkiewicz v. Louisiana*, 560 F.Supp. 911, 913–14 (M.D.La. 1983). We further note that a panel of this court has strongly indicated that *all* Louisiana executive departments are entitled to eleventh amendment immunity. *See Fireman's Fund Ins. Co. v. Department of Transp. & Dev.*, 792 F.2d 1373, 1375 (5th Cir.1986).

6. It is clear that Dr. Bobear, the medical director of Charity, Dr. Robinson, the Secretary of DHHR, and Roberts, the director of Charity, are all state officials for the purposes of eleventh amendment analysis. It is not clear from the record, however, whether Drs. Barkman and Hanna, the physicians who wrote the letter to Dr. Bobear, were employed by Charity or DHHR. We assume for the purposes of our analysis, without deciding this issue, that they, too, are state officials.

*parte Young* [209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)] in which a federal court enjoined the Attorney General of the State of Minnesota from bringing suit to enforce a state statute that allegedly violated the Fourteenth Amendment. This Court held that the Eleventh Amendment did not prohibit issuance of this injunction. The theory of the case was that an unconstitutional enactment is "void" and therefore does not "impart to [the officer] any immunity from responsibility to the supreme authority of the United States." Since the State could not authorize the action, the officer was "stripped of his official or representative character and [was] subjected in his person to the consequences of his individual conduct."

While the rule permitting suits alleging conduct contrary to "the supreme authority of the United States" has survived, the theory of *Young* has not been provided an expansive interpretation. Thus, in *Edelman v. Jordan* [415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)] the Court emphasized that the Eleventh Amendment bars some forms of injunctive relief against state officials for violation of federal law. In particular, *Edelman* held that when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief. Under the theory of *Young*, such a suit would not be one against the State since the federal-law allegation would strip the state officer of his official authority. Nevertheless, retroactive relief was barred by the Eleventh Amendment.

*Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101–03, 104 S.Ct. 900, 908–09, 79 L.Ed.2d 67, 79–80 (1984) (citations and footnotes omitted). In this case, Dr. Darlak has alleged that the defendant state officials acted unconstitutionally in suspending his staff privileges at the hospital without providing him with a due pro-

cess hearing, and he seeks injunctive relief requiring the officials to rescind his suspension. Hence, that part of this case [7] is a suit seeking prospective injunctive relief against state officials who are alleged to have acted unconstitutionally, and therefore the *Ex parte Young* exception to the eleventh amendment applies and both the district court and this court have jurisdiction to reach the due process issue presented.

## IV. Due Process of Law

■ Turning to the due process issue, we must first determine whether Dr. Darlak had a property right in his staff privileges at Charity before we may decide the issue of whether he was deprived of such a right without due process of law. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494, 501 (1985). It is well-settled in this circuit that a physician's staff privileges may constitute a property interest protected by the due process clause of the fourteenth amendment. *See Northeast Georgia Radiological Assoc. v. Tidwell*, 670 F.2d 507, 511 (Former 5th Cir. Unit B March 1982) (collecting cases). As this court has stated:

> Where medical staff privileges have been held to constitute an interest protected by the fourteenth amendment, it has been because there was an explicit or implicit agreement providing for no termination of the privileges without cause and a hearing, or because denial of staff privileges "might effectively foreclose ... practicing in the area because of harm to [a] professional reputation and because of the lack of other [comparable] facilities."

*Daly v. Sprague*, 675 F.2d 716, 727 (5th Cir.1982) (citations omitted), *cert. denied*, 460 U.S. 1047, 103 S.Ct. 1448, 75 L.Ed.2d 802 (1983). We think that the Charity regulations providing for a hearing prior to the suspension or termination of staff privileges implies that such privileges will be

**7.** It is not clear from Dr. Darlak's brief whether he has abandoned his claims for money damages against these defendants. To the extent

that money damages are sought, however, *Ex parte Young* is inapplicable and the Eleventh Amendment constitutes a bar to suit.

suspended or terminated only for cause, and that therefore such privileges constitute a property interest protected' by the fourteenth amendment.

 Having determined that Dr. Darlak's staff privileges at Charity constituted a property right within the meaning of the due process clause of the fourteenth amendment, it is next necessary to determine whether Dr. Darlak received all the process that he was due prior to both the interim suspension of his staff privileges and the suspension of his staff privileges after the hearing before the Credentials Committee. In determining what process was due Dr. Darlak, we again turn to the teaching of the Supreme Court on this issue. Writing in the context of termination of government employment, that Court has stated:

> An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." We have described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

*Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493, 84 L.Ed.2d at 503–04 (1985) (citations and footnote omitted) (emphasis in original). In determining the type of hearing required by the due process clause in a given situation, the Supreme Court, in reviewing its prior decisions on the subject, stated:

These decisions underscore the truism that " '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. More precisely, our prior decisions indicate that identification of the specific dictates of due process requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18, 33 (1976) (citations omitted). Applying these principles to the facts of the case *sub judice* convinces us that Dr. Darlak received all the process that was due, both with respect to the initial suspension of his staff privileges pending a full hearing [8] and with respect to the two-month suspension of his staff privileges following the hearing before the Credentials Committee. We analyze each suspension separately.

On the issue of the interim suspension pending investigation by the Credentials

---

**8.** Dr. Darlak argues that the Charity regulations allow a physician to be suspended pending a full hearing without even the minimal investigation and the meeting afforded Darlak in this case, and that the regulations are therefore unconstitutional. We decline to address this argument. In deciding the due process issue in this case, we focus instead on the procedures *actually employed* in effectuating Dr. Darlak's suspension. Dr. Darlak also argues that, to comport with *substantive* due process, it is necessary that temporary suspensions pending a full hearing only be undertaken in an emergency or extraor-

dinary situation. Without expressing an opinion on the merits of this argument, we think that if due process requires an emergency or extraordinary situation to justify the suspension of a physician's staff privileges, such a situation existed in this case. We think that the performance of instrusive diagnostic procedures on a patient by a physician without the approval and against the wishes of the patient's primary care physicians constitutes a sufficient risk to the quality of health care at a public hospital to warrant a temporary suspension pending a full hearing.

Committee, the private interest at stake is relatively minor. Admittedly, a physician would rather not be suspended from staff privileges even temporarily, but the affected physician may continue to practice medicine, albeit not at that hospital, and therefore is not deprived of his livelihood. Furthermore, the temporary suspension allowed by Charity's regulations provides that the time between the temporary suspension and the hearing before the Credentials Committee will be only 30 days. Finally, although the record is barren on this point, it seems obvious that if the hearing before the Credentials Committee results in a finding of no professional misconduct on the part of the suspended physician, the temporary suspension would be rescinded as imposed without cause. The physician's private interest in not being temporarily suspended pending a full hearing, therefore, while certainly not *de minimus*, is relatively minor when compared to the other interests at stake. Turning to the state interest, it is clear that "[t]he state has a legitimate interest, through continuing supervision, in maintaining the quality of medical care provided within its facilities." *Daly v. Sprague*, 742 F.2d 896, 899 (5th Cir.1984).

Considering the final factor, the risk of an erroneous deprivation of a physician's staff privileges through the temporary suspension procedures used, and the probable value, if any, of additional or substitute procedural safeguards, we think that the procedures afforded Dr. Darlak served to minimize, as much as possible, the risk of erroneous deprivation. In this case, Dr. Bobear, after receiving the letter from Drs. Barkman and Hanna containing the allegations against Dr. Darlak, spoke to both Drs. Barkman and Hanna concerning the allegations, spoke with Drs. Lastra and Abel, the patient's primary care physicians, and met with Dr. Darlak and another physician to discuss the allegations. Whereas

additional procedures would undoubtedly contribute to minimize the possibility of error, we think that the temporary suspension procedures employed in this case were sufficient under the circumstances to insure that there was some basis for the suspension.

■ Balancing the competing interests in light of the procedures employed convinces us that the requirements of due process were satisfied in the case of Dr. Darlak's initial suspension pending a full investigation. In this case, an expedited investigation of the allegations was undertaken by Dr. Bobear, and Dr. Darlak was given an opportunity at the meeting with Dr. Bobear to explain or deny the allegations. These procedures "provide a meaningful hedge against erroneous action," and are sufficient to satisfy procedural due process. *See Goss v. Lopez*, 419 U.S. 565, 583, 95 S.Ct. 729, 741, 42 L.Ed.2d 725, 740 (1975).[9]

■ Turning to the procedures followed which resulted in the two-month suspension of Dr. Darlak, we believe that his interest in the maintenance of his staff privileges at Charity, which constitutes the first prong of our analysis, increased in importance, since the potential deprivation in this case is for a longer period of time, and could result in permanent suspension of staff privileges and a permanent blemish on his professional record. We note that the state's interest in this case is much the same as in the case of temporary suspensions pending a full hearing—the maintenance of the quality of medical care at state hospitals. However, to counter the increased private interest in this case, additional procedures were employed. A full investigation was conducted by the Credentials Committee. Dr. Darlak was allowed to address the Committee and, although he presented no witnesses and offered no evidence, there is no allegation in the record

9. Dr. Darlak also argues that his due process rights were violated because no advance notice was given him of the meeting with Dr. Bobear. Due process, however, does not always require advance notice of a hearing. In a case involving an interim suspension of a physician's staff

privileges pending a full hearing, we think that "[t]here need be no delay between the time 'notice' is given and the time of the hearing." *Goss v. Lopez*, 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725, 739 (1975).

that he was prevented from doing so.[10] Under Charity's regulations, Dr. Darlak was also entitled to appeal the recommendation of the Credentials Committee, which he chose not to do. Based on our weighing of the above factors, we hold that Dr. Darlak received all the due process required by the Constitution.[11]

## V. Disposition Below

In summary, the district court was correct in dismissing DHHR and Charity, the state entities in this case, on eleventh amendment grounds, by granting their motion to dismiss for lack of subject-matter jurisdiction, but this dismissal does not constitute a judgment on the merits. " 'A dismissal for want of jurisdiction bars access to federal courts and is *res judicata* only of the lack of a federal court's power to act. It is otherwise without prejudice to the plaintiff's claims, and the rejected suitor may reassert his claim in any competent court.' " *Voisin's Oyster House, Inc.*, 799 F.2d at 188 (quoting *Daigle v. Opelousas Health Care, Inc.*, 774 F.2d 1344, 1348 (5th Cir.1985)). In its judgment, the district court did not specify that the dismissal as to DHHR and Charity was without prejudice, and did not expressly state that the dismissal was for lack of jurisdiction. However, in its minute entry the court made it clear that the dismissal was on eleventh amendment grounds. We affirm this dismissal, expressly noting that it does not constitute a judgment on the merits.

Similarly, the district court was correct in granting summary judgment in favor of Drs. Bobear and Barkman. Because we hold that under the undisputed facts of this case, Dr. Darlak received all the process that was due him, these defendants were entitled to judgment as a matter of law,

and we therefore affirm the district court's grant of summary judgment as to them. *See* Fed.R.Civ.P. 56(c).

■ Turning to the district court's disposition of Dr. Darlak's claims against Dr. Hanna, we also affirm. As noted above, the district court treated Dr. Hanna's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted as a motion for summary judgment. The district court's authority to do this is provided in Federal Rule of Civil Procedure 12(c), which provides:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). Turning to Rule 56, the Rule provides that "[t]he motion shall be served at least ten days before the time fixed for the hearing." Fed.R.Civ.P. 56(c). "It is a well established rule in this circuit that a motion to dismiss, under Rule 12(b), when treated as a motion for summary judgment, must also abide by the procedural safeguards of Rule 56." *Capital Films Corp. v. Charles Fries Prods., Inc.*, 628 F.2d 387, 391 n. 1 (5th Cir.1980). However,

> [u]nder Rule 56, it is not necessary that the district court give ten days' notice after it decides to treat the Rule 12(b)(6) motion as one for summary judgment,

10. Dr. Darlak argues that the Committee had a duty to speak with Dr. Sarcar, since Dr. Darlak had claimed that he had made a verbal request of Dr. Sarcar to do the biopsy procedure. We believe that it is Dr. Darlak who should have brought Dr. Sarcar to the hearing before the Credentials Committee. At oral argument, counsel for Dr. Darlak argued that Dr. Darlak, not being an attorney, was unaware that he could or should have presented evidence or witnesses at the hearing before the Credentials Committee. We reject this argument. We are

unprepared to hold that due process requires that a physician be represented by counsel at a hearing such as this to insure that the physician presents the best possible case.

11. Dr. Darlak sued the individual defendants in their individual, as well as their official, capacities. Since we hold that Dr. Darlak's due process rights were not violated, we need not reach the issue of whether the individual defendants would be protected by qualified immunity.

but rather after the parties receive notice that the court could properly treat such a motion as one for summary judgment because it has accepted for consideration on the motion matters outside the pleadings, the parties must have at least ten days before judgment is rendered in which to submit additional evidence.

*Clark v. Tarrant County,* 798 F.2d 736, 746 (5th Cir.1986) (citing *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389 (6th Cir.1975)). We find *Clark* to be controlling in the instant case. As the district court noted in its minute entry treating Dr. Hanna's motion as one for summary judgment, both Dr. Darlak and Dr. Hanna adopted by reference the memoranda they filed in support of and in opposition to the summary judgment motions of Drs. Bobear and Barkman. Furthermore, in his opposition to Dr. Hanna's motion to dismiss filed on May 8, 1986, Dr. Darlak adopted by reference affidavits filed with his earlier memorandum in opposition to the summary judgment motion of Drs. Bobear and Barkman. Hence, we hold that on May 8, 1986, the time that Dr. Darlak adopted by reference matters outside the pleadings, Dr. Darlak had ample facts to put him on notice that the district court could properly treat Dr. Hanna's motion to dismiss as one for summary judgment because it had accepted for consideration on the motion matters outside the pleadings. Since the district court did not render judgment before the expiration of ten days after the filing of Dr. Darlak's opposition to Dr. Hanna's motion, we hold that the requirements of Rule 56 were met in this case.

We turn now to the district court's disposition of the claims against the remaining defendants, Dr. Robinson and Elliot Roberts. These defendants moved for dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1) as to suit against them in their official capacities, and for dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6) as to suit against them in their individual capacities. As we held above, the district court did not lack subject-matter jurisdiction over the claims against these defendants in their official capacity, because those

claims seeking prospective injunctive relief fall within the *Ex parte Young* exception to the doctrine of eleventh amendment immunity. However, as this opinion makes clear, there was no violation of Dr. Darlak's due process rights, and therefore these defendants have no liability to Dr. Darlak in their official capacity. Hence, we affirm on other grounds the district court's dismissal as to Roberts and Robinson in their official capacities.

The district court also granted the Rule 12(b)(6) motion of these defendants on the claims against them in their individual capacities, stating that "[a]lthough plaintiff sued Roberts and Robinson in their individual and official capacities, the facts do not warrant the imposition of individual liability." In the memorandum in support of their Rule 12(b)(6) motion, Roberts and Robinson argued that there was no allegation in Dr. Darlak's complaint that either of these defendants had any role in the alleged wrongful acts or policies, and we assume that this was the ground upon which the district court granted their motion.

We agree with the district court. Dr. Darlak's complaint fails to allege any acts on the part of these defendants which would impose individual liability. "In the now familiar cases involving 42 U.S.C. § 1983 we consistently require the claimant to state specific facts, not merely conclusory allegations." *Elliott v. Perez,* 751 F.2d 1472, 1479 (5th Cir.1985) (footnote omitted). Hence, we affirm the district court's dismissal of the claims against Roberts and Robinson in their individual capacities.

## VI.

For the above reasons, the judgment of the district court is AFFIRMED.