**ILLINOIS PSYCHOLOGICAL ASSOCIATION, Dr. Jean J. Rossi, and Dr. John R. Day, Plaintiffs-Appellants,**

v.

**Marshall FALK, et al., Defendants-Appellees.**

No. 86–2069.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1987.

Decided May 12, 1987.

Michael R. Levinson, Alexander-Unikel-Zalewa-Tenenbaum, Chicago, Ill., for plaintiffs-appellants.

Bret A Rappaport, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before WOOD, POSNER and MANION, Circuit Judges.

POSNER, Circuit Judge.

This is an appeal from the denial of a preliminary injunction in a suit under section 1 of the Civil Rights Act of 1871, now 42 U.S.C. § 1983. The plaintiffs—the Illinois Psychological Association and two of its members—had sought the injunction in order to prevent the Illinois Department of Public Health and the Illinois Hospital Licensing Board from putting into effect an interpretation of an administrative regulation. As interpreted, the regulation bars psychologists from membership on the medical staffs of hospitals (public and private) regulated by the state; and without such membership a psychologist cannot admit a patient to the hospital, cannot order treatment for him in the hospital, and cannot vote on hospital policies. The plaintiffs claim that the interpretation denies them equal protection of the laws; deprives them of property or liberty (or both) without due process of law (because the interpretation is unrelated to any rational state policy, and because it was adopted without proper procedures); and violates the state's administrative procedure act. The last is of course a pendent claim. The district judge, though agreeing that the plaintiffs had demonstrated irreparable harm—and more such harm than the defendants would suffer if the preliminary injunction were granted—denied the request for a preliminary injunction, as he thought the plaintiffs had little chance of prevailing on the merits of their case, 638 F.Supp. 876 (N.D.Ill.1986).

The regulation, which dates back to 1976, defines a hospital's medical staff as

an organized body composed of individuals granted the privilege by the governing authority of the hospital to practice in the hospital. Any of the following who are granted practice privileges by a hospital shall be placed on the hospital's Medical Staff: persons who are graduates of a college or school approved or recognized by the Illinois Department of Registration and Education, and who are currently licensed by the Department as a Doctor of Medicine, M.D.; Doctor of Osteopathy, D.O.; Doctor of Dental Surgery, D.D.S.; or Doctor of Podiatric Medicine, D.P.M.

77 Ill.Admin.Code § 250.150(a). Although there is no mention of psychologists, some hospitals in Illinois read the regulation to mean that while anyone in one of the four categories who was given practice privileges by a hospital *had* to be placed on the hospital's medical staff, any other duly licensed health professional given practice privileges by a hospital *could* also be placed on the hospital's medical staff. The individual plaintiffs in this case, as well as an unknown number of other psychologists, are members of hospital medical staffs.

In 1985, after the national body that accredits hospitals changed its standards to authorize greater state control over the composition of hospital staffs, the Illinois Department of Public Health—allegedly without complying fully with the rulemaking procedures required by the state's administrative procedure act—announced that it interpreted the regulation to mean that only persons in the four categories can be members of hospital medical staffs. The plaintiffs call this a "new" interpretation. The defendants reply that they were merely repeating what had long been their understanding of the regulation. The interpretation was "new," however, at least in the sense of making it very difficult for hospitals to ignore the regulation any longer, as many had done by appointing psychologists to their staffs. Since a hospital that fails to obey the new interpretation (as we shall continue to refer to it) risks having its license revoked, and hospitals therefore are likely to obey the new interpreta-

tion to the serious detriment of the plaintiffs and the class they represent, we stayed the effective date of the new interpretation until this appeal could be decided. See Fed.R.App.P. 8(a).

The new interpretation does not interfere with a hospital's giving psychologists practice privileges. But if allowed to go into effect it may as a practical matter force psychologists having hospital practices to work with psychiatrists. The psychologist will not be able to admit a patient to the hospital on his own or to order treatment on his own; admission and treatment orders will have to be signed by physicians (we can ignore dental surgeons in this setting), who in the case of patients requiring psychological diagnosis or care will ordinarily be psychiatrists. Psychiatrists and psychologists, who differ primarily in that the former are physicians and can therefore administer drug therapy as well as psychiatric therapy while the latter can administer only psychiatric therapy (or psychological diagnosis), are competitors for patients having mental-health problems. The psychologists rightly fear that the new interpretation will give psychiatrists a new competitive advantage.

The defendants argue that the interpretation is necessary to protect patients, by making sure that a physician is involved in the decision to admit the patient to the hospital and in all treatment decisions and that physicians control the hospital's medical policies (which are set by the hospital's medical staff). Little evidence to back up this argument has yet been presented in this case. So far as appears, psychologists have been members of the medical staffs of Illinois hospitals for many years without incident. Nationwide, between 20 and 25 percent of clinical psychologists have hospital staff privileges of some kind. See Dörken, Webb & Zaro, *Hospital Practice of Psychology Resurveyed: 1980*, 13 Prof. Psych. 814 (1982). It is possible, as the plaintiffs argue, that even more psychologists would have such privileges were it not for the political "clout" of psychiatrists, who want to prevent psychologists from competing effectively with them.

Psychiatry is among the least well paid medical specialties, see Owens, *Doctors' Earnings: The Year of the Big Surprise,* 62 Med.Econ. 195, 203 (1985), and psychiatrists may therefore be particularly eager to defend their "turf" and particularly energetic in organizing political support for their position. All this, however, is conjecture. Reputable psychiatrists have argued in reputable professional journals that psychiatrists' participation in the hospital treatment of patients with psychological disturbances is necessary to ensure proper care of these patients. See Guze, *Nature of Psychiatric Illness: Why Psychiatry Is a Branch of Medicine,* 19 Comprehensive Psychiatry 295 (1978); Berlin et al., *The Patient Care Crisis in Community Mental Health Centers: A Need for More Psychiatric Involvement,* 138 Am.J.Psychiatry 450 (1981). Maybe they are right.

The plaintiffs argue that even if their chance of winning this case is (and they do not concede it is) weak, they are entitled to a preliminary injunction because the balance of harms is so strongly in their favor. They are quite right to note that this circuit has adopted the "sliding scale" approach to deciding whether to grant or deny preliminary relief, see, e.g., *Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1433 (7th Cir.1986), so that even though a plaintiff has less than a 50 percent chance of prevailing on the merits, if he can show that the cost to him of not getting preliminary relief is greater than would be the cost to the defendant if such relief were ordered he may be entitled to the injunction. *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 387 (7th Cir.1984). If for example a plaintiff had only a one-third chance of winning, implying that on average one out of three plaintiffs in this type of case has a claim that would be found meritorious at trial, yet denial of preliminary relief would cause him catastrophic harm while granting preliminary relief would not harm the defendant in the least, it would be at once unjust to the meritorious plaintiff, and unnecessary for the protection of the meritorious defendants, to deny preliminary relief in these cases. It is this principle that the plaintiffs invoke in this case.

■ But we do not agree with their factual premise, which is that the harms from grant or denial of preliminary injunction are asymmetrical in this case. True, the state has not shown any tangible harm from further delay in effectuating its new interpretation. But it would be shortsighted to conclude that a federal injunction preventing the state from effectuating the interpretation would therefore be harmless to the state; nor did the district judge suggest this. He suggested the opposite, though he did so in the context of considering whether the public interest favored the grant or denial of the plaintiffs' request for a preliminary injunction. A federal judge should be reluctant to grant a preliminary injunction against state regulation, especially regulation of safety and health, unless persuaded that the plaintiff has a good chance, not merely a nonnegligible one, of winning when the case is fully tried. The public interest (more concretely, the interests of persons other than the parties to the lawsuit), a traditional consideration in deciding whether to grant or deny an injunction, see, e.g., *Yakus v. United States,* 321 U.S. 414, 440–41, 64 S.Ct. 660, 674–75, 88 L.Ed. 834 (1944); *Roland Machinery Co. v. Dresser Industries, Inc., supra,* 749 F.2d at 388, and considerations of comity toward the states as sovereign entities (greatly diminished sovereigns, to be sure), support our conclusion that state action should not be set at naught, even temporarily, without a showing that the plaintiff's legal rights have probably been infringed.

■ We must therefore consider the merits of the plaintiffs' claims. One of the claims can be disposed of summarily. The pendent claim must go. The Supreme Court held in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 106, 117–21, 104 S.Ct. 900, 917–19, 79 L.Ed.2d 67 (1984), that the Eleventh Amendment bars a federal court from entertaining a pendent statelaw claim against state officials. That is the nature of the pendent claim in this case.

■ The equal protection claim can fare no better. The plaintiffs contend that there is no rational distinction, so far as membership on hospital medical staffs is concerned, between psychiatrists and psychologists. To state the proposition is to refute it. The federal courts long ago, and whether rightly or wrongly, got out of the business of second-guessing state decisions on occupational licensure. See *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

Granted, there is now a large body of scholarly literature which questions the wisdom of occupational licensure and might question the wisdom of Illinois' excluding psychologists from hospital medical staffs. The scholars have found that governmental restrictions on the professions create barriers to entry, reduce competition, and raise professional incomes, without bringing about compensating increases in the quality of professional services. See, e.g., Paul, *Physician Licensure Legislation and the Quality of Medical Care*, 12 Atl.Econ.J. 18 (1984); Leffler, *Physician Licensure: Competition and Monopoly in American Medicine*, 21 J.Law & Econ. 165 (1978); Gellhorn, *The Abuse of Occupational Licensing*, 44 U.Chi.L.Rev. 6 (1976); Maurizi, *Occupational Licensing and the Public Interest*, 82 J.Pol.Econ. 399 (1974); Shepard, *Licensing Restrictions and the Cost of Dental Care*, 21 J.Law & Econ. 187 (1978); see generally Occupational Licensure and Regulation (Rottenberg ed. 1980). However, neither this literature, nor the broader literature (of which it is a part) that is skeptical of regulation, see, e.g., Jordan, *Producer Protection, Prior Market Structure and the Effects of Government Regulation*, 15 J.Law & Econ. 151 (1972), has yet persuaded the courts to reconsider their hands-off policy toward economic regulation challenged under the Constitution. In cases in which exclusion from professional or occupational opportunities is challenged on equal protection grounds, as in other economic equal protection cases, the courts continue to cite *Williamson v. Lee Optical* with approval. See, e.g., *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (per curiam); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981); *Vaden v. Village of Maywood*, 809 F.2d 361, 364–65 (7th Cir.1987); *Sutker v. Illinois State Dental Society*, 808 F.2d 632, 635–36 (7th Cir.1986). *Williamson* controls our decision of this case—whatever we might personally think of the Court's Manichaean conception of "personal" versus "economic" rights, on which see, e.g., Director, *The Parity of the Economic Market Place*, 7 J.Law & Econ. 1 (1964); Siegan, Economic Liberties and the Constitution (1980), and despite the Court's unexpected dictum in *Lynch v. Household Finance Corp.*, 405 U.S. 538, 552, 92 S.Ct. 1113, 1121, 31 L.Ed.2d 424 (1972), that "the dichotomy between personal liberties and property rights is a false one.... [A] fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other. That rights in property are basic civil rights has long been recognized."

*Williamson* upheld a regulation which forbade opticians to fit eyeglass *frames* without a prescription from an ophthalmologist or optometrist. A gossamer-thin public-health justification was offered, and accepted. Our *Sutker* case was much like *Williamson*. It upheld an Illinois statute that forbade "denturists" (persons who make and repair dentures) to fit dentures to the patient's mouth. The regulatory interpretation in the present case is, on its face, more reasonable than the statute in *Sutker*, and much more reasonable than that in *Williamson*. The Fifth Circuit has rejected equal protection claims, by podiatrists and osteopaths denied hospital staff privileges, that are almost identical to the claims in this case. See *Shaw v. Hospital Authority of Cobb County*, 507 F.2d 625, 627–28 (5th Cir.1975); *Stern v. Tarrant County Hospital District*, 778 F.2d 1052, 1060–61 (5th Cir.1985) (en banc). Indeed, the Supreme Court denied a similar claim by osteopaths sixty years ago, see *Hayman v. City of Galveston*, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927), at a time

when economic rights had a much higher status in constitutional law than they have today—though admittedly it was also a time of widespread doubts about the safety and efficacy of osteopathic medicine (doubts since calmed by the convergence of osteopathic with allopathic medicine). The authority against the plaintiffs' equal protection claim is overwhelming.

■ Equally unavailing is the plaintiffs' argument that their exclusion from medical staffs is so irrational that it denies them "substantive due process." This durable oxymoron allows persons harmed by state regulation to complain that the regulation is so unreasonable a deprivation of life, liberty, or property that it is unconstitutional even if adopted and applied in conformity with the most rigorous procedural safeguards, so that no denial of due process of law in the usual sense can be shown. The principal modern exemplar of substantive due process is the right of "privacy" (as it is loosely called) that has been held in a number of cases, most famously *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), to limit the authority of the states to regulate sex, reproduction, and the family. See also *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion). Or perhaps one should say principal avowed modern exemplar, for the application of the substantive provisions of the Bill of Rights (such as freedom of speech) to the states by interpretation of the due process clause of the Fourteenth Amendment, and the creation of "fundamental rights" under the equal protection clause, see, e.g., *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), rest on the same commitment to a broad-ranging judicial creativity not confined by the words or origins of the Fourteenth Amendment as the cases that use the term "substantive due process." For an articulate defense of that commitment see *Poe v. Ullman*, 367 U.S. 497, 541–44, 81 S.Ct. 1752, 1775–77, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).

■ Whatever right the plaintiffs in this case think they are asserting in the name of substantive due process, however, it is not the right of privacy. Nor, of course, are they complaining about being beaten up by police—a type of claim that, surprisingly, is sometimes treated as a claim to substantive due process rather than to freedom from unreasonable seizure. See *Gumz v. Morrissette*, 772 F.2d 1395, 1399–1400 (7th Cir.1985); but see *id.* at 1405–06 (concurring opinion). If the present complaint states a claim upon which relief can be granted in the name of substantive due process, this would imply the displacement of almost the whole of state regulation from state legislatures, state administrative agencies, and state courts into federal courts. The Supreme Court has shown no inclination to accept this additional burden on the overstretched capacities of the federal courts, and we have no desire to anticipate its doing so. We note that the Fifth Circuit recently rejected a claim of substantive due process similar to that made by the plaintiffs here. See *Hyde v. Jefferson Parish Hospital District No. 2*, 764 F.2d 1139, 1141 (5th Cir.1985).

The plaintiffs' strongest claim is to a denial of due process in its more conventional sense of fair procedure. Although the challenged interpretation has the effect (so the plaintiffs claim) of changing the meaning of the regulation, it was adopted (they further claim) without compliance with the rulemaking procedures that would be mandatory under state law if a new regulation were being adopted. The plaintiffs argue that no administrative or judicial procedures are open to them under Illinois law for challenging the interpretation. While in principle a hospital could defy the defendants, and in any proceeding to revoke its license defend on the ground that the interpretation is invalid, no hospital (the plaintiffs say with considerable plausibility) will dare take this costly, uncertain, and dangerous route. It is so much easier for a hospital to kick the psychologists off its medical staff.

■ Although we are sympathetic to the plaintiffs' plight, we have the gravest doubt whether, even if everything they say about the character and consequence of the

new interpretation is correct, they have shown a denial of due process. The due process clause does not require fair notice and an opportunity for a hearing (the essential constituents of adjudicative due process) when a public official charged with enforcing a statute or administrative regulation merely announces his interpretation of the statute or regulation. Such announcements can do substantial harm and may be difficult to obtain judicial review of, but they are not the type of governmental action that has been thought to trigger a right to demand procedural safeguards. The (federal) Administrative Procedure Act, while requiring federal agencies to give notice of proposed rules, makes an exception for "interpretative rules," 5 U.S.C. § 553(b)(A); see, e.g., *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983), and the interpretation challenged in the present case was no more than that. The Supreme Court has admonished the lower federal courts not to graft additional procedural requirements onto agency proceedings beyond what the Administrative Procedure Act imposes. See *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 543–48, 98 S.Ct. 1197, 1211–14, 55 L.Ed.2d 460 (1978); for a contrary view see 2 Davis, Administrative Law Treatise §§ 7:17 to 7:20 (2d ed. 1979). We do not see how the Fourteenth Amendment could be thought to require state agencies to give notice of proposed interpretations when the Fifth Amendment imposes no such requirement on federal agencies.

■ Maybe, though, if the interpretation were really as wild and woolly as the plaintiffs argue this one is, it could be regarded as promulgating a brand-new regulation and therefore made subject to whatever limits the due process clause places on the procedures used (or not used) by states to promulgate regulations. They are very loose limitations, however. See, e.g., *Bi-Metallic Investment Co. v. State Bd. of Equalization*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915) (Holmes, J.); *United States v. Florida East Coast Ry.*, 410 U.S. 224, 244–45, 93 S.Ct. 810, 820–21, 35 L.Ed.2d 223 (1973); *Philly's v. Byrne*, 732

F.2d 87, 91–93 (7th Cir.1984). *Atkins v. Parker*, 472 U.S. 115, 105 S.Ct. 2520, 2529–30, 86 L.Ed.2d 81 (1985), holds that there is no right to notice of a change in statutory entitlements; its logic may extend to regulations. All this is unnecessary to pursue, however, since the defendants' interpretation, far from being wild and unexpected, is the natural interpretation of the regulation. It is the plaintiffs' interpretation that is strained. The regulation designates who may be a member of a hospital's medical staff, and psychologists are not among the designees. The plaintiffs' interpretation is not absurd, but since it is not the natural interpretation, their quarrel is less with the interpretation placed on the regulation by the defendants than with the regulation itself. It is not even the case that the interpretation changed an earlier interpretation that was in the plaintiffs' favor. The "new" interpretation appears to be the only one the defendants have ever held, but because the regulation wasn't being obeyed they decided it would be a good idea to restate their understanding of it. A reasonable interpretation of a regulation is not a denial of due process, and the plaintiffs do not argue that the regulation itself (much as they may dislike it) is a denial of due process in a nonsubstantive sense.

Even if all this is wrong we don't think the plaintiffs have shown a deprivation of either liberty or property, and such a showing is a prerequisite to maintaining a suit under the due process clause. The clause does not make the denial of due process actionable; it only makes the deprivation of life, liberty, or property, without due process of law, actionable.

One of the liberties protected by the due process clause is occupational liberty. See our recent discussion in *Colaizzi v. Walker*, 812 F.2d 304 (7th Cir.1987), and cases cited there; and *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361, 365–66 (9th Cir.1976). The only protection it receives under modern law is, as we suggested earlier, procedural; but this means that a deprivation of occupational liberty is actionable if, though only if, due process in the sense of fair procedure has been de-

nied. The plaintiffs have not been deprived of their occupational liberty, however. They have not had their licenses to practice psychology taken away. They have not even lost their hospital privileges. They just have been taken off (or will be if the hospitals bow to the new interpretation) hospital medical staffs. This will be a curtailment of their occupational freedom, but a curtailment is not a deprivation. Otherwise every occupational regulation, such as a tax on barbershops or a requirement that doctors take refresher exams periodically, would be within the purview of the due process clause. Being a member of a hospital's medical staff is not an occupation; it is a privilege attached to an occupation; the removal of the privilege, without exclusion, formal or practical, from the occupation is therefore not a deprivation of occupational liberty. As we held in *Bigby v. City of Chicago*, 766 F.2d 1053, 1057 (7th Cir.1985), being a police officer is an occupation; being a police lieutenant is not. Being a psychologist is an occupation; being a member of a hospital's medical staff is not.

The last string on the plaintiffs' bow is the argument that they have a property interest, within the meaning of the due process clause, in remaining on hospital staffs of which they are members. They analogize the interpretation that will require their exclusion from medical staffs to the firing of a tenured state employee. When the state fires such an employee it deprives him of job rights that the Supreme Court has analogized to property because tenure can be revoked only for good cause, a characteristic that gives it the kind of permanency associated with formal property rights. See, e.g., *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985). In *Daly v. Sprague*, 675 F.2d 716, 727 (5th Cir.1982), and earlier cases cited in *Daly*, this reasoning was extended to the termination of hospital staff privileges. See also *Darlak v. Bobear*, 814 F.2d 1055, 1061 (5th Cir.1987). There are two difficulties with the extension. The first, and lesser, is that a member of a hospital's medical staff has no contractual relation-ship with the state unless it is a state hospital; the state hasn't fired anyone. But this is not critical, because, as we said recently in *Weinstein v. University of Illinois*, 811 F.2d 1091, 1096 (7th Cir.1987), if the state takes away a right granted by private contract, it may be held to have deprived the holder of property within the meaning of the due process clause. The second and more serious difficulty is that the due process clause does not protect contract rights as such. Some contracts create property rights—tenure contracts have been held to do so as we have said—but it would be surprising to equate every contractual entitlement to a property right. We doubt that a contract entitling a doctor or other professional to hospital staff privileges during good behavior should be equated for constitutional purposes to a contract entitling a public school teacher to retain his job during good behavior.

But we need not pursue this question. As *Daly v. Sprague* makes clear, if a plaintiff has no contractual right to hospital staff privileges—if he enjoys them in the discretion of the hospital—then their termination is not the deprivation of a property right. See 675 F.2d at 727. The plaintiffs do not argue that they have any contractual entitlement to staff privileges; indeed they disclaim any such entitlement. This disclaimer disclaims them out of court, so far as any argument based on the deprivation of a property right is concerned.

■ The plaintiffs have not shown a sufficient likelihood of success on the merits to warrant a preliminary injunction against a state regulation, and the district judge was therefore right to deny the request for one. Although we have grave doubts whether the plaintiffs can repair the deficiencies in their proof—their case seems inherently remote from the purposes of the Fourteenth Amendment as interpreted in the modern cases—we do not desire to prejudge the trial, if the plaintiffs press for one. We hold only that the preliminary injunction was rightly denied.

AFFIRMED.