**Wood M. DEMING, M.D.; Regional Cardiology Consultants, P.C., Plaintiffs,**

v.

**JACKSON–MADISON COUNTY GENERAL HOSPITAL DISTRICT, et al., Defendants.**

**No. 05–1032–T/An.**

United States District Court,
W.D. Tennessee,
Eastern Division.

March 26, 2008.

Ralph Bard, Bard & Associates, Tullahoma, TN, Jonathan P. Lakey, Pietrangelo Cook, Memphis, TN, for Plaintiffs.

Jerry D. Kizer, Jr., Patrick Wayne Rogers, Dale Conder, Jr., Rainey Kizer Reviere & Bell, Jackson, TN, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

JAMES D. TODD, District Judge.

Plaintiffs Wood M. Deming, M.D. and Regional Cardiology Consultants, P.C. filed a complaint on February 8, 2005 against the Jackson–Madison County General Hospital District ("JMCGHD"); West Tennessee Healthcare, Inc. ("WTH"); James ("Jim") Moss, who was at that time the President and Chief Executive Officer of WTH; Currie Sanders, General Counsel for WTH; Dean Currie, M.D.; James Ellis, M.D.; John Matthews, M.D.; Shawn Isaeff, M.D.; John Baker, M.D.; Charles Hertz, M.D.; R. Paul Caudill, M.D.; the American Medico–Legal Foundation, Inc. ("AMF"); Christopher Cates, M.D.; Joseph Garasic, M.D.; and Khusrow A.K. Niazi, M.D. In his complaint, Plaintiff alleges civil rights violations pursuant to 42 U.S.C. § 1983; specifically, he alleges that the Defendants violated his constitutional rights under the Due Process Clause and the Equal Protection Clause of the United States Constitution. Plaintiff also asserts antitrust claims under the Sherman Act, 15 U.S.C. § 1 *et seq.*, claims under Tennessee law for breach of contract, business disparagement and defamation, tortious interference with business relationships, vio-

lation of the Tennessee Consumer Protection Act, Tenn.Code Ann. § 47–18–101 *et seq.*, intentional infliction of emotional distress, and civil conspiracy.

The Defendants have filed a motion to dismiss and/or for summary judgment. (Docket Entries # 47–# 48.) The Plaintiffs responded to the motion (D.E. # 84) and Defendants were permitted to file a reply. (D.E. # 101.) For the reasons set forth below, the Defendants' motion is GRANTED.

Motions for summary judgment are governed by Fed.R.Civ.P. 56. If no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Fed.R.Civ.P. 56(c). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party may not rest upon the pleadings but must go beyond the pleadings and "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

"If the defendant ... moves for summary judgment ... based on the lack of proof of a material fact, ... [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter but only to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505. Rather, "[t]he inquiry on a summary judgment motion ... is ... 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. 2505). Doubts as to the existence of a genuine issue for trial are resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Plaintiff Deming is an interventional cardiologist and the sole owner of Plaintiff Regional Cardiology Consultants, a professional corporation. He contends that the Defendants wrongfully revoked his privileges to perform peripheral vascular studies/interventions ("PVI") at JMCGHD in order to protect their own economic interests. According to Deming, the Defendants contrived to conduct a sham peer review process during the course of which they accused him of performing unnecessary PVI procedures, thereby creating the false impression that he was a threat to patients.

The undisputed facts are as follows. In December 2000, as authorized by the JMCGHD Medical Staff Bylaws, JMCGHD's Medical Executive Committee ("MEC") created the PVI Subcommittee. The stated purpose of the PVI Subcommittee was to develop criteria for credentialing physicians to perform PVI procedures at JMCGHD.[1] The first meeting of the PVI Subcommittee was held on December

---

1. Prior to this time, PVI procedures at JMCGHD had been performed by radiologists. For several years, other specialists, including cardiologists such as the Plaintiff, had sought to perform these procedures. (Dr. Currie Aff. ¶ 4.)

19, 2000, at which time its duties and responsibilities were approved; no cardiologist had yet been granted PVI privileges. One of the committee's objectives was to review the first twenty-five PVI cases of all physicians who were granted new PVI privileges. (Dr. Currie Aff. ¶¶ 4–6; Defs.' Ex. C, Mins. 12/19/00 Mtg.) On February 27, 2001, Deming's application for PVI privileges was approved. (Dr. Currie Aff. ¶ 7.) [2]

At a meeting of the PVI Subcommittee on April 26, 2002, Dr. John Shaw, who was then JMCGHD's Chief of Medical Staff, appointed Defendant Dr. Currie as Chairman and Defendant Dr. Ellis as Vice Chairman. Defendants Dr. Matthews, Dr. Isaeff, Dr. Baker, and Dr. Caudill were also members of the PVI Subcommittee. [3] The Subcommittee discussed the procedure for reviewing the first twenty-five cases of new physicians granted PVI privileges, as well as the need to develop criteria for appropriateness of the PVI procedures, expected complications and other matters. (Dr. Currie Aff. ¶ 9; Defs.' Ex. E, Mins. 4/26/02 Mtg.) At a subsequent meeting on May 30, 2002, the PVI Subcommittee discussed that the credentialing criteria required not only review of a physician's first twenty-five PVI cases, but also periodic re-evaluation with closer review if the success rate was less than 85%

or the complication rate greater than 5%. (Dr. Currie Aff. ¶ 10; Defs.' Ex. F, Mins. 5/30/02 Mtg.)

The PVI Subcommittee met again on August 27, 2002 and began discussing Plaintiff's [4] first twenty-five PVI cases. [5] The minutes of that meeting state, "[d]ocumentation is a problem in most of these cases so it is difficult to know exactly what was done and why. Over utilization appears to be a possibility." (Defs.' Ex. I, Mins. 8/27/02 Mtg.; Dr. Currie Aff. ¶ 13.) It was noted that documentation of indications for the PVI procedures and results was lacking in the majority of Plaintiff's cases; therefore, the PVI Subcommittee determined that a letter should be sent to Plaintiff expressing those concerns. *Id.*

On or about September 12, 2002, Plaintiff received a letter from Dr. Currie setting forth the PVI Subcommittee's concerns that, in thirteen of the twenty-five cases, there was "a lack of written documentation of clinical findings justifying the performance of the procedure, a lack of radiographic documentation of the findings, or both." (Defs.' Ex. J, letter from Dr. Currie; Dr. Currie Aff. ¶ 14.) Dr. Currie further advised Plaintiff that the Clinical Process Improvement ("CPI") team would review all vascular studies, not merely the first twenty-five for each physi-

---

**2.** Deming already had cardiology privileges at JMCGHD, *id.*

**3.** Defendant Dr. Caudill was JMCGHD Medical Director and Vice President of Medical Affairs. The remaining physician members of the PVI Subcommittee at that time were Heath Broussard, M.D.; Kevin Sentell, M.D., and Ronald Weiner, D.O. (Defs.' Exs. D–E.) These three physicians are not named as defendants in this action.

**4.** Due to peer review confidentiality, physicians under peer review are sometimes referred to by number rather than by name. For that reason, Plaintiff is referred to as MD # 724 in some documents.

**5.** At previous meetings in July 2002, the PVI Subcommittee had discussed another physician's (MD # 2079) first twenty-five PVI cases and determined that an independent review would be appropriate. (Dr. Currie Aff. ¶¶ 11–12; Defs.' Ex. G–H, Mins. 7/2/02 & 7/30/02 Mtgs.) However, because Plaintiff and a third physician also had completed their first twenty-five PVI cases, it was decided at the August meeting that once the PVI Subcommittee's review of those cases was completed, all three physicians' cases would be recommended for independent review. (Dr. Currie Aff. ¶ 13; Defs.' Ex. I, Mins. 8/27/02 Mtg.)

cian, for "appropriateness of procedure" and that if any "physician were found to fall outside the accepted indications for performing visceral or peripheral arteriogram or angioplasty, that physician would risk loss of [PVI] privileges." *Id.*

On September 20, 2002, the PVI Subcommittee met and recommended that Dr. Currie report to the MEC its concerns about the PVI procedures and ask the MEC to authorize an Investigative Committee. It was further recommended that the cases of the three physicians in the first group, including Plaintiff Deming, be sent for independent review "due to a high complication rate and poor judgment in patient selection for one physician reviewed and poor documentation and lack of indications for all physicians." (Defs.' Ex. K, Mins. 9/20/02 Mtg.; Dr. Currie Aff. ¶ 15.)

The MEC received the PVI Subcommittee's report at its October 14, 2002 meeting. Dr. Currie reported the concerns about the PVI cases reviewed by the PVI Subcommittee and recommended both an investigation and an independent, outside review of the cases. Dr. Shaw, the Chief of Staff, agreed with those recommendations. The MEC then passed a formal resolution authorizing the formation of an Ad Hoc Investigative Committee made up of three individuals [6] and also authorizing that Investigative Committee to use outside consultants for an external review of the PVI cases. (Defs.' Ex. L, Mins. 10/14/02 Mtg.; Dr. Currie Aff. ¶ 16.) In executive session following the MEC's regular meeting on November 12, 2002, it was reaffirmed that the records of all three physicians in that first group to complete twenty-five PVI cases, which included

Plaintiff, would be sent for external review. (Defs.' Ex. M, Mins. 11/12/02 Mtg.)

In accordance with the authorization by the MEC, Plaintiff's first twenty-five PVI cases were sent to Defendant AMF [7] for an outside, independent peer review, as were the cases of the other two physicians in that first group. AMF is a consulting agency for hospital peer review that retains consultants to provide independent peer review evaluations. In this instance, AMF retained Defendants Dr. Cates, Dr. Garasic and Dr. Niazi, all interventional cardiologists, to perform the independent peer review of the PVI cases. (Dr. Currie Aff. ¶ 18.)

On October 30, 2003, the PVI Subcommittee met and discussed one of Plaintiff's cases that was referred by the CPI team as falling outside the criteria established for PVI procedures. The Subcommittee decided to send a letter to Plaintiff requesting an explanation of the lack of documentation. (Defs.' Ex. O, Mins. 10/20/03 Mtg.; Dr. Currie Aff. ¶ 19.) Therefore, Dr. Currie sent a letter to Plaintiff dated November 21, 2003, setting forth the Subcommittee's concerns about that particular case and requesting further information about the appropriateness of the PVI procedure. (Defs.' Ex. P, letter from Dr. Currie.) Plaintiff responded to Dr. Currie by letter dated December 8, 2003, explaining why he believed the PVI procedure was appropriate. (Defs.' Ex. Q, letter from Plaintiff.) Over the next several months, the PVI Subcommittee continued to review cases referred by the CPI team as falling outside the criteria for PVI procedures, including many of Plaintiff's cases. On behalf of the PVI Subcommittee, Dr. Currie communicated with Plain-

6. The members of the Investigative Committee were Dr. Currie, Dr. Baker and Dr. Matthews. (Defs.' Exs. V & Y, Mins. 6/3/04 & 6/10/04 Mtgs.)

7. According to Defendants, the American Medico–Legal Foundation, Inc. is a division of the American Medical Foundation for Peer Review and Education, which is the correct name of the consulting agency.

tiff, via memoranda, concerning the lack of documentation supporting the appropriateness of the PVI procedures in those cases. (Dr. Currie Aff. ¶ 22; Defs.' Ex. R, Min. 12/22/03 & 4/23/04 Mtgs.) [8]

At a PVI Subcommittee meeting on May 20, 2004, several more of Plaintiff's cases were reviewed and there was discussion regarding Plaintiff's continued lack of documentation supporting the appropriateness of the PVI procedures he was performing. It was noted that "[s]everal of the reviewers feel he consistently over calls the level of stenosis," and was thus performing unnecessary procedures. (Defs.' Ex. S, Min. 5/20/04 Mtg.; Dr. Currie Aff. ¶ 23.) The PVI Subcommittee voted unanimously [9] to recommend to the MEC that Plaintiff's PVI privileges be temporarily suspended pending additional investigation. *Id.* While the Subcommittee had the authority to make such a recommendation, it could not revoke or otherwise limit Plaintiff's privileges on its own. (Dr. Currie Aff. ¶ 23.)

At the time of the May 20, 2004 PVI Subcommittee meeting, the independent peer review conducted by the AMF consulting physicians had been substantially completed. (Defs.' Ex. U, AMF Report.) Dr. Currie was aware of the results of the AMF Report at the time of the May 20 meeting; however, he states that he did not inform the other Subcommittee members of the results "so as not to taint or influence their decision in any way." (Dr.

Currie Aff. ¶ 23.) The AMF Report was very critical of Plaintiff, and the reviewing consultants summarized their findings as follows:

> In our opinion, Dr. Deming demonstrated poor documentation and marginal technical ability, with frequently no indication for the reviewed procedures. He often greatly overstated lesion severity and inadequate documentation was present in many of the reviewed procedures. Dr. Deming demonstrated evidence of medical negligence in doing these procedures without indication, while grossly overestimating the degree of stenosis in the chart. His privileges to perform these procedures should be suspended.

(Defs.' Ex. U at 2.) Plaintiff was forwarded an unredacted copy of the AMF Report on May 25, 2004. (Defs.' Ex. T, cover letter from Dr. Caudill.) [10]

The Investigative Committee previously authorized by the MEC met on June 3, 2004, in order to review Plaintiff's cases and the AMF Report. In accordance with the Medical Staff Bylaws, the Investigative Committee then gave Plaintiff the opportunity to meet with them and respond to the AMF report. (Defs.' Ex. V, Mins. 6/3/04 Mtg.; Defs.' Ex. W, letter from Dr. Caudill; Dr. Currie Aff. ¶ 24.) That meeting took place on June 10, 2004, at which time Plaintiff presented evidence in rebuttal to the AMF Report; following Plaintiff's presentation, he was excused. After discussion, the Investigative Committee de-

---

**8.** Exhibit R includes not only the minutes of the 12/22/03 and 4/23/04 PVI Subcommittee meetings, but also copies of four separate memoranda from Dr. Currie requesting that Plaintiff respond to the PVI Subcommittee's concerns regarding the appropriateness of the PVI procedures performed in specific cases. Two of the memoranda are dated January 7, 2004 and two are dated May 3, 2004.

**9.** Dr. Matthews had already left the meeting when the vote was taken. *Id.*

**10.** The initial AMF Report contained the independent reviews of twenty-three of Plaintiff's first twenty-five PVI cases. A Supplemental Report containing AMF's independent review of the last two of Plaintiff's first twenty-five PVI cases was forwarded to Dr. Caudill on June 9, 2004. (Defs.' Ex. X, Supplemental AMF Report.)

termined that its final recommendation to the MEC would consist of the following:

1. We found no overriding egregious technical failures

2. Tends to intervene in marginal cases

3. Frequently overcalls degree of stenosis

4. Inadequate documentation in H & P, procedure reports and outpatient and discharge summaries

5. Practice is not in line with this hospital's documented standard of care in dealing with renal artery stenosis and peripheral aterial [sic] disease,

6. The Peripheral Vascular Subcommittee and the external review recommend suspension of peripheral vascular privileges and the Investigative Subcommittee finds no reason to alter that recommendation.

(Defs.' Ex. Y, Mins. 6/10/04 Mtg.)

On June 14, 2004, the MEC met in closed session. Defendant Dr. Hertz was, at that time, Chief of Staff [11] and thus chairman of the MEC. (Dr. Hertz Aff. ¶ 3; Defs.' Ex. GG, Bylaws [12] § 6.1.1(b).) The MEC reviewed and discussed the AMF Report, the Investigative Committee's final recommendation that Plaintiff's PVI privileges be suspended, and the PVI Subcommittee's similar recommendation. A motion to recommend the revocation of Plaintiff's PVI privileges was made and seconded; after further discussion, a motion was made and seconded to amend the first motion to add an immediate precautionary suspension of Plaintiff's PVI privileges. The motions passed unanimously, with two members having already left prior to the vote. (Defs.' Ex. Z, Mins. 6/14/04 Mtg.; Dr. Hertz Aff. ¶ 7.) By letter dated June 17, 2004, Dr. Hertz notified Defendant Jim Moss, President and CEO of JMCGHD, of the action taken by the MEC. (Defs.' Ex. AA, letter from Dr. Hertz.; Dr. Hertz Aff. ¶ 8.)

Moss advised Plaintiff, also by letter dated June 17, 2004, of the action taken against him and his right to request a hearing. (Defs.' Ex. BB, letter from J. Moss.) By letter dated June 18, 2004, Dr. Hertz also formally notified Plaintiff, by certified mail, that the MEC had suspended his PVI privileges, effective immediately. (Defs.' Ex. CC, letter from Dr. Hertz; Dr. Hertz Aff. ¶ 9.) Dr. Hertz also notified Plaintiff that the chairman and officers of the MEC would hold a special meeting with him on June 24, 2004 to allow him to contest the immediate, precautionary nature of the suspension. *Id.* On June 21, 2004, Plaintiff notified Moss by letter that he was officially requesting a hearing on the MEC's recommendation to suspend his PVI privileges. (Defs.' Ex. DD, letter from Plaintiff.)

At the special June 24, 2004 meeting of the MEC, Plaintiff read a prepared statement. (Defs.' Ex. FF, Statement of Deming; Dr. Hertz Aff. ¶ 10.) Following his statement, Plaintiff was excused; after discussion, the committee agreed that the MEC's recommendation for an immediate, precautionary suspension would remain unchanged and that the hearing would be held as soon as possible. (Defs.' Ex. EE, Mins. 6/24/04 Mtg.; Dr. Hertz Aff. ¶ 10.)

The hearing requested by Plaintiff was held on October 21, 2004 in accordance with the JMCGHD Medical Staff Bylaws, Credentialing Policy, and Hearing and Appeal Procedures.[13] The Hearing Panel

---

11. Dr. Hertz became Chief of Staff on January 27, 2004. (Dr. Hertz Aff. ¶ 3.)

12. A copy of the Medical Staff Bylaws is attached to Defendants' motion for summary judgment as exhibit GG.

13. Copies of the Credentialing Policy and the Hearing and Appeal Procedures are attached to Defendants' motion for summary judgment as Exhibits HH and II.

was made up of three independent physicians who were not in economic competition with Plaintiff.[14] (Defs.' Ex. II, Hrg. & App. Proc. § 2.5(a).) Plaintiff was represented by legal counsel, who submitted evidence on his behalf and was permitted to examine and cross-examine witnesses. *Id.* § 3.5(a).

Following the hearing, the Hearing Panel issued a unanimous report, a copy of which was provided to Plaintiff on or about November 10, 2004. (Defs.' Ex. KK, cover letter from J. Moss.) The Hearing Panel Report provided:

We, the undersigned, have served as members of the hearing panel for the hearing requested by Dr. Wood Deming as a result of the revocation of his peripheral vascular privileges by the executive committee of the Jackson–Madison County Hospital. In performance of our duties we reviewed the full hospital chart, including cine angiography, of patients who had angiography, stinting and/or angioplasty of one or multiple renal arteries. All of these cases were performed in 2001. In addition we heard testimony from other physicians and reviewed case lists involving other patients from other dating from 2001–2003.

In the course of this hearing, Dr. Deming testified that each and every one of the cases presented by the outside reviewers fell well within the standard of care. We find that he did not appear to understand the process of peer review resulted from the fact that, among the physicians reviewed, he had the highest percentage of cases with deviations of quality indicators, thus triggering a more critical review.

We concur with the outside reviewers' assertions that Dr. Deming:

• demonstrated poor technique by

1. The failure to adequately assess and/or document pressure gradients

2. The failure to obtain multiple views to demonstrate lesion severity, especially in lesions that appear angiographically to be not hemodynamically significant

3. The use of visually estimated cross sectional area stenosis as a surrogate for diameter stenosis in analysis of lesion severity

• repeatedly and substantially overestimated lesion severity due to poor technique

• performed inappropriate interventions as a result

We find that Dr. Currie, chairman of the peripheral vascular subcommittee, appropriately endeavored to preclude introduction of potential bias amongst the voting membership of the subcommittee by not disseminating the results of the outside review prior to the vote to revoke Dr. Deming's privileges.

After careful evaluation of submissions by the parties, testimony of witnesses and exhibits, we *do not* find that Dr. Deming has proved by clear and convincing evidence that the recommendation of the executive committee prompting this hearing was arbitrary, capricious or lacked any factual basis. We concur with the recommendation of the Medical Executive Committee that Dr. Deming's peripheral vascular privileges be revoked.

(Defs.' Ex. JJ, Hrg. Panel Rpt.) Plaintiff, through counsel, notified Moss on November 16, 2004 that he was officially requesting an appeal of the Hearing Panel Report.

14. The three members of the Hearing Panel were Brad S. Burlew, M.D., Mark Koenig, M.D. and Lucius F. Wright, M.D.

(Defs.' Ex. LL, letter from A. Pietrange-lo.) [15]

Plaintiff's appeal of the Hearing Panel Report was heard on March 9, 2005. The Review Panel, consisting of Mr. Sammie Arnold, Mr. Bruce Bledsoe and Mr. Gerald Ferguson, Jr.,[16] heard oral argument and reviewed the entire record, including the transcript of the hearing and all exhibits, the Hearing Panel Report, and the briefs submitted by the parties. The Review Panel submitted its written recommendation to JMCGHD's Board of Trustees on April 18, 2005. (Defs.' Ex. MM, Recomm. of Review Panel.) That recommendation was as follows:

> After deliberating, this Review Panel was of the unanimous opinion that Dr. Wood M. Deming received a fair hearing; that the substantial evidence presented at the Fair Hearing fully supports both the recommendations of the Fair Hearing Panel and the Medical Executive Committee; that the recommendations of the Hearing Panel were NOT made arbitrarily, capriciously or with

prejudice; and that the appellate review should be declared finally adjourned.

> It is, therefore, the recommendation of the Review Panel that the Board of Trustees affirm the action taken by the Medical Executive Committee and by the Fair Hearing Panel in recommending that Dr. Deming's peripheral vascular privileges be revoked by revoking those privileges.

*Id.*

On April 26, 2005, the Board of Trustees met and agreed that the recommendation of the Review Panel should be adopted for "the specific reasons stated therein." The Board thus passed a resolution adopting the recommendation of the Review Panel and affirming the action taken by the Hearing Panel and the MEC by revoking Plaintiff's PVI privileges. (Defs.' Ex. NN, Board Resolution.) Also on April 26, 2005, Earl Anderson, the Chairman of the Board, notified Plaintiff of the Board's action via certified mail.

In their motion to dismiss and/or for summary judgment, Defendants argue they are entitled to judgment as a matter of law on nineteen separate grounds.[17]

---

**15.** The complaint in this case was filed on February 8, 2005, prior to the completion of the administrative appeal process.

**16.** Pursuant to Hrg. & App. Proc. § 5.4(a), the Chairman of JMCGHD's Board of Trustees must appoint a Review Panel of at least three persons, including no more than two members of the Board and "including but not limited to reputable persons outside the Hospital." Mr. Arnold and Mr. Bledsoe were both members of the Board of Trustees; Mr. Ferguson was a person not affiliated with JMCGHD. (Defs.' Ex. MM, Recomm. of Review Panel.)

**17.** The grounds enumerated by Defendants are: 1) West Tennessee Healthcare, Inc. is not a proper Defendant; 2) pursuant to the Health Care Quality Improvement Act, 42 U.S.C. § 11101 et seq., Defendants are immune from liability for monetary damages for Plaintiff's claims of breach of contract, business disparagement, defamation, interference with business relationships, violation of

the Tennessee Consumer Protection Act, intentional infliction of emotional distress, civil conspiracy, violations of the Sherman Act, and all other state and federal law claims except for Plaintiff's claims of civil rights violations pursuant to the United States Constitution; 3) Defendants did not violate Plaintiff's due process rights; 4) because the revocation of Plaintiff's PVI privileges is not a deprivation of a liberty interest, Plaintiff cannot establish a violation of the Due Process Clause; 5) because Plaintiff was afforded all of the process to which he was constitutionally entitled, Plaintiff cannot establish that he was deprived of a property interest in violation of the Due Process Clause; 6) Plaintiff has been given an opportunity to be heard at a meaningful time and in a meaningful manner; 7) Plaintiff has not been deprived of rights guaranteed by the substantive component of the Due Process Clause of the Fourteenth Amendment; 8) Plaintiff has failed to state a claim upon which relief may be granted under the "Stigma Plus" doc-

However, as fewer grounds are dispositive, the Court need not address each of those nineteen grounds. Furthermore, with respect to several of these enumerated grounds, Plaintiff has failed to respond to Defendants' specific arguments or offer any evidence in opposition, apparently conceding the issues.

The first argument to which Plaintiff did not respond is Defendants' assertion that WTH is not a proper Defendant. Thus, all claims against WTH are subject to dismissal. Plaintiff also has failed to respond to Defendants' arguments regarding his civil conspiracy claims or to the various arguments concerning his claims under the Sherman Act. For that reason, the Defendants are entitled to summary judgment on these claims as well.

*HCQIA Immunity*

Defendants contend that, pursuant to the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 *et seq.*, they are immune from liability for money damages on all claims except for Plaintiff's constitutional claims. The purpose of the HCQIA is "to provide for effective peer review and interstate monitoring of incompetent physicians, and to grant qualified immunity from damages for those who participate in peer review activities." *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 467 (6th Cir.2003); 42

U.S.C. § 11101. If a professional review action meets certain specified reasonableness standards, those participating in the review "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action." § 11111(a)(1). Those granted immunity include:

(A) the professional review body,

(B) any person acting as a member or staff to the body,

(C) any person under a contract or other formal agreement with the body, and

(D) any person who participates with or assists the body with respect to the action.

*Id.* As to the required reasonableness standards, the HCQIA provides:

For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other pro-

trine; 9) Plaintiff is unable to establish the critical element of causation; 10) Defendants did not violate the Equal Protection Clause; 11) Plaintiff has failed to state a claim upon which relief may be granted against JMCGHD under 42 U.S.C. § 1983; 12) Plaintiff has failed to state a claim upon which relief may be granted against the individual Defendants; 13) Defendants Currie, Ellis, Matthews, Isaeff, Baker, Hertz, Caudill, Moss, Sanders, Cates, Garasic and Niazi are entitled to qualified immunity; 14) Plaintiff has failed to state a claim upon which relief may be granted against Defendants for civil conspiracy; 15) all of the Defendants are immune from the Plaintiff's claims of violations of the Sherman Act pursuant to the "State Action Immunity Doctrine"; 16) all of the Defendants are immune from damages for violations of the Sherman Act pursuant to the Local Government Anti–Trust Act set forth at 15 U.S.C. § 34 *et seq.;* 17) Plaintiff has failed to allege sufficient facts to support an "interstate commerce" nexus in order to bring this case within the parameters of the Sherman Act; 18) Plaintiff's claims pursuant to the Sherman Act should be dismissed because Defendants had legitimate reasons to revoke Dr. Deming's PVI privileges; and 19) Plaintiff has waived all legal claims against these Defendants. (Defs.' Mot. Summ. J., D.E. # 47 at 2–4.)

cedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

§ 11112(a). The rebuttable presumption created by the HCQIA requires Plaintiff to overcome that presumption by showing that the Defendants' actions during the peer review process were not reasonable. *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333 (11th Cir.1994).

[T]he rebuttable presumption of HCQIA section 11112(a) creates an unusual summary judgment standard that can best be expressed as follows: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendant's actions are outside the scope of § 11112(a)?" *Austin [v. McNamara*, 979 F.2d 728, 734 (9th Cir.1992)]. If not, the court should grant the defendant's motion.

*Id.; see also Spencer v. Jackson–Madison County Gen. Hosp.*, No. 97–1165, slip op. at 47 (W.D.Tenn. Aug. 25, 1999).

The first prong of the HCQIA immunity test is whether the decision to revoke Plaintiff's PVI privileges was taken in the "reasonable belief that the action was in the furtherance of quality health care." § 11112(a)(1). "This prong ... is met if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect pa-

tients." *Bryan*, 33 F.3d at 1334–1335 (internal quotation marks and citation omitted); *Meyers*, 341 F.3d at 468; *Spencer*, No. 97–1165, slip op. at 48.

Plaintiff contends that the peer review process in this case was motivated by personal and professional hostility toward him because he posed an economic threat to his competitors on the PVI Subcommittee. However, the test of reasonableness under the HCQIA is objective, so that whether the reviewers were subjectively motivated by bad faith is irrelevant.

The courts which have addressed the issue of immunity under the HCQIA have been unanimous in holding that a plaintiff cannot prove the "unreasonableness" of a defendant's actions by introducing evidence suggesting that a defendant acted in "bad faith." Rather, the courts have held that such evidence is irrelevant. A defendant's actions must be judged on an objective basis. Accordingly, what is relevant, and dispositive, is whether there existed an objectively reasonable basis for the defendant's actions.

*Reyes v. Wilson Mem'l Hosp.*, 102 F.Supp.2d 798, 811 (S.D.Ohio 1998); *see also Bryan*, 33 F.3d at 1335; *Austin v. McNamara*, 979 F.2d at 734 ("[A]ssertions of hostility ... are irrelevant to the reasonableness standards of § 11112(a). The test is an objective one, so ... the real issue is the sufficiency of the basis for the [Hospital's] actions."); *Talwar v. Mercer County Joint Twp. Cmty. Hosp.*, 520 F.Supp.2d 894, 901 (N.D.Ohio 2007).

The PVI Subcommittee's initial action regarding Plaintiff in 2002 was initially prompted by their review of his first twenty-five PVI cases, in many of which they noted significant problems with documentation supporting the appropriateness of the procedures and possible overutilization. Therefore, the PVI Subcommittee brought their concerns to the MEC, which

authorized the formation of the Investigative Committee and empowered it to send the first twenty-five cases of three physicians, including Plaintiff, to AMF for outside, independent review.

On into 2004, the PVI Subcommittee continued to review the PVI cases of all physicians, including Plaintiff, that were referred by the CPI team as falling outside certain criteria,[18] even beyond the first twenty-five. Numerous problems continued to be a concern with Plaintiff's cases, and he was given several opportunities to respond to these concerns. Several members of the PVI Subcommittee felt that Plaintiff consistently overstated the level of stenosis and performed unnecessary procedures; consequently, in May 2004 the PVI Subcommittee voted to recommend to the MEC that Plaintiff's PVI privileges be suspended.

The physicians retained by AMF for the independent review considered Plaintiff's first twenty-five PVI cases. These AMF reviewers also were very critical of Plaintiff, echoing the concerns of the PVI Subcommittee that Plaintiff was overstating the level of stenosis and performing medically unnecessary procedures. As did the PVI Subcommittee, the AMF reviewers recommended that Plaintiff's PVI privileges be suspended. The Investigative Committee then met with Plaintiff and gave him an opportunity to respond to the AMF Report, but he failed to satisfy their concerns. Therefore, the Investigative Committee made a final recommendation to the MEC that Plaintiff's privileges be suspended. On June 14, 2004, the MEC met and considered the AMF Report and its conclusions, as well as the recommendations of both the PVI Subcommittee and the Investigative Committee. The MEC concurred in those recommendations, and voted to suspend Plaintiff's PVI privileges, effective immediately.

At the hearing held on October 21, 2004, Plaintiff and the Hospital were each represented by counsel and presented evidence. The Hearing Panel heard evidence regarding the conclusions reached by the AMF reviewers, and Dr. Cates and Dr. Garasic appeared and testified on behalf of themselves and AMF. Not only were the witnesses questioned by counsel, but the members of the Hearing Panel were also allowed to ask questions, as were Dr. Cates and Dr. Garasic, as representatives of AMF. Dr. Currie testified regarding the actions taken by the PVI Subcommittee and the Investigative Committee, based on their ongoing review of Plaintiff's cases. Plaintiff testified in his own behalf and also presented his own experts, Joseph S. Weinstein, M.D. and Kishore K. Arcot, M.D., who testified that they disagreed with the conclusions of the reviewers and believed that the actions against Plaintiff were motivated by a "turf war" between radiologists and cardiologists.

Having considered all of this evidence, the Hearing Panel found that Plaintiff had failed to show, by clear and convincing evidence, that the actions of the MEC were arbitrary, capricious or lacking in any factual basis. The Review Panel also reviewed the evidence and the entire record and concluded that the hearing was fair, the Hearing Panel's findings were not arbitrary or capricious, and that the decision was supported by substantial evidence. The Board concurred in that deci-

---

18. These criteria are referred to as SIM criteria. In his response, Plaintiff argues heavily against the validity of these criteria. However, Dr. Currie testified in his deposition that the SIM criteria are merely a tool designed for nurses who review charts for quality assurance. Since nurses do not have the clinical expertise of doctors, the SIM criteria set out, in written form, objective standard indications for various procedures. They were guidelines to aid the nurses in determining which charts needed further scrutiny via the peer review process. (Dr. Currie Dep. at 29–41.)

sion, and revoked Plaintiff's PVI privileges.

Other than his own assertions of bias and personal animosity, which are echoed in the affidavits of other physicians submitted in support of his response to Defendants' motion (Pl.'s Ex. 1, Dr. Weinstein Aff., D.E. # 90–3; Pl.'s Ex. 7, Dr. Winston Aff., D.E. # 90–9), Plaintiff has offered no relevant evidence showing that the action taken against him by the reviewers was not done in the reasonable belief that it furthered quality health care. The fact that Plaintiff and his witnesses disagree with the medical conclusions reached by the outside reviewers and the various committees is insufficient. Even if the Defendants "reached an incorrect conclusion on a particular medical issue because of a lack of understanding, that does not meet the burden of contradicting the existence of a *reasonable belief* that they were furthering health care quality in participating in the peer review process." *Imperial v. Suburban Hosp. Ass'n, Inc.,* 37 F.3d 1026, 1030 (4th Cir.1994) (emphasis in original); *see also Sugarbaker v. SSM Health Care,* 190 F.3d 905, 914 (8th Cir.1999); *Brader v. Allegheny Gen. Hosp.,* 167 F.3d 832, 841–43 (3rd Cir.1999).

The Court finds that Plaintiff has failed to offer sufficient evidence to permit a reasonable jury to conclude that he has overcome, by a preponderance of the evidence, the presumption that the Defendants' actions were taken in the reasonable belief that those actions would further quality health care.

■ The relevant inquiry under the second prong of the HCQIA immunity test is "whether the totality of the process leading up to the Board's 'professional review action' . . . evidenced a reasonable effort to obtain the facts of the matter." *Meyers,*

341 F.3d at 469; *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 637 (3rd Cir. 1996); 42 U.S.C. 11112(a)(2). This prong is where Plaintiff concentrates most of his argument in opposition to HCQIA immunity. He contends that the AMF reviewers either failed to review or ignored certain medical evidence which shows that he was not performing unnecessary PVI procedures. He asserts that these failures rendered the peer review process itself unreasonable.

Plaintiff relies heavily on the affidavit of Dr. Weinstein, which also concentrates solely on the opinions of the AMF reviewers, and includes a case by case "critique" of the AMF Report. (Pl.'s Ex. 1, Dr. Weinstein Aff., D.E. # 90–3.) Both the affidavit and critique assume that significant information was omitted from the patients' charts or ignored, and that this renders the conclusions of the AMF reviewers invalid. *Id.* In Plaintiff's own affidavit, he details a wealth of information he claims the AMF reviewers did not have, did not consider, or considered wrongly. (Pl.'s Aff. ¶ 77ff, D.E. # 91–2.) However, Plaintiff was given ample opportunity during the peer review process, particularly during the hearing, to point out any deficiencies in the AMF Report and offer any additional evidence that he considered relevant to the cases reviewed. In fact, Plaintiff testified extensively at the hearing regarding several of the individual cases in the AMF Report. If he believed significant information from any of the patient charts was not provided to the AMF reviewers, he had the opportunity to make the Hearing Panel aware of it at that time. Indeed, a Hearing Panel may reject a recommendation from the MEC on the ground that it lacks any factual basis. (Defs.' Ex. II, Hrg. & App. Proc. § 4.1(a).) [19]

**19.** It is significant that Plaintiff did not sue the members of the Hearing Panel or the

Review Panel, and apparently does not con-

The argument that all relevant information was not provided to the AMF reviewers also assumes that the decision to revoke Plaintiff's PVI privileges was based exclusively on the findings in the AMF Report. However, it is clear from the record that the decision was based not only on AMF Report, but also on the review and evaluation of subsequent cases by the various committees involved in the process.

Plaintiff's actual focus is on his disagreement with the conclusions reached in the AMF Report, which he has attempted to bootstrap into an argument that the Defendants failed to make a reasonable effort to obtain the facts. The undisputed evidence in the record, however, is to the contrary, and the Court finds that Plaintiff has failed to offer sufficient evidence to permit a reasonable jury to conclude that he has overcome, by a preponderance of the evidence, the presumption that the Defendants' action was taken only after a reasonable effort to obtain the facts of the matter.

■ The third prong of the HCQIA immunity test is whether the Defendants' action was taken "after adequate notice and hearing procedures are afforded to the physician involved." § 11112(a)(3). There is no contention in this case that Plaintiff was given inadequate notice of the action proposed to be taken against him or the reasons therefor. Plaintiff also does not argue that the notice of the hearing was insufficient, that he was not allowed to present relevant evidence or to cross-examine witnesses, or that the Hearing Panel was biased. Cf. § 11112(b) (setting out specific "safe harbor" provisions which are

deemed to satisfy the requirement of § 11112(b)).[20]

The record shows that Plaintiff was provided with notice of the action to be taken against him, the reasons therefor, and a copy of the Hearing and Appeal Procedures. (Defs.' Ex. BB, letter from J. Moss.) He requested a formal hearing (Defs.' Ex. DD, letter from A. Pietrangelo), which was held before a Hearing Panel composed of three individuals with whom he was not in economic competition. (Defs.' Ex. A, Hrg. Tr.; Defs.' Ex. II, Hrg. & App. Proc. § 2.5(a).) Plaintiff was represented by legal counsel and was allowed to present any relevant evidence of his choosing and to call, examine, and cross-examine the witnesses. (Defs.' Ex. II, Hrg. & App. Proc. 3.5(a).) He was then allowed to appeal the Hearing Panel's adverse decision to a Review Panel. Id. § 5.

■ The Court concludes that no reasonable jury could find that Plaintiff has overcome, by a preponderance of the evidence, the presumption that he was afforded adequate notice and hearing procedures.

The final prong of the HCQIA immunity test is whether the action was taken "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." § 11112(a)(4). The inquiry under subsection (a)(4) "closely tracks" the analysis under subsection (a)(2). Brader, 167 F.3d at 843; see also Meyers, 341 F.3d at 471; Gabaldoni v. Washington County Hosp. Ass'n, 250 F.3d 255, 263 n. 7 (4th Cir.2001); Sugarbaker, 190 F.3d at 916. As noted under the Court's analysis of

tend that any of these individuals were biased against him or wrongfully failed to consider all of the evidence with which they were presented.

20. Section 11112(b) also provides, however, that failure to meet the specific "safe harbor" provisions "shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section."

subsection (a)(2), the inquiry is an objective one, and allegations of bias and animosity are irrelevant. *See Bryan,* 33 F.3d at 1335; *Austin,* 979 F.2d at 734; *Reyes,* 102 F.Supp.2d at 811.

Again, while Plaintiff argues that certain relevant information was either omitted from the information provided to the AMF reviewers, ignored by them, or wrongly considered, the Court has determined that he has failed to show that the Defendants did not make a reasonable effort to obtain the facts of the matter. Even if there were an issue of fact as to the adequacy of care, that would not be sufficient to rebut the presumption that the Defendants' decision was made in the reasonable belief that it was warranted by the facts known. The evidence in the record demonstrates that the various committees, the Hearing Panel, the Review Panel and the Board had a factual basis for their action. Therefore, the Court concludes that no reasonable jury could find that Plaintiff has overcome the presumption, by a preponderance of the evidence, that the Defendants' actions were not taken in the reasonable belief that it was warranted by the facts.

For all of these reasons, Defendants' are entitled to immunity under the HCQIA on all of Plaintiff's claims for money damages, including his claims under the Sherman Act, his claims for breach of contract, business disparagement, defamation, tortious interference with business relationships, violation of the Tennessee Consumer Protection Act, intentional infliction of emotional distress, civil conspiracy, and all other claims under federal and state law, with the exception of his constitutional claims under 42 U.S.C. § 1983.

*Claims Pursuant to 42 U.S.C. § 1983*

Section 1983 creates a federal cause of action to redress violations of rights protected by the Constitution or laws of the United States. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). Plaintiff alleges that the Defendants violated his rights under both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment.

1. *Equal Protection*

■ It is well-settled that when considering an equal protection claim, unless the challenged action involves a suspect classification or impinges on a fundamental right, minimal scrutiny under the rational basis test is appropriate. *See San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), *cited in Whittle v. United States,* 7 F.3d 1259, 1262 (6th Cir.1993). Fundamental rights include voting, privacy, interstate travel, and freedoms of speech and association, and the right to procreate. *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312 n. 3, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam). Suspect classifications include alienage, race, national origin and sex. *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440–41, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Murgia,* 427 U.S. at 312 n. 3, 96 S.Ct. 2562.

The Sixth Circuit held in *Whittle* that "[t]here is no basis in law for the argument that the right to pursue one's chosen profession is a fundamental right for the purpose of invoking strict scrutiny under the Equal Protection Clause." *Whittle,* 7 F.3d at 1262 (quoting *Lupert v. Calif. State Bar,* 761 F.2d 1325, 1327 n. 2 (9th Cir.1985)). In addition, Plaintiff does not contend that he is a member of any suspect class. Therefore, the Defendants' peer review procedures need only meet the rational basis test.

The rational basis test requires a showing that the challenged government action "bears some rational relationship to a legitimate state objective." If it does, the

action must be upheld. *Manson v. Edwards,* 482 F.2d 1076, 1077 (6th Cir.1973); *see also Ledesma v. Block,* 825 F.2d 1046, 1051 (6th Cir.1987) ("[A] statutory classification violates the Equal Protection Clause if it 'rests on grounds wholly irrelevant to the achievement of [any governmental] objective.'") (quoting *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice is results in some inequality.

*Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (internal quotation marks and citation omitted). "A statute is presumed constitutional, ... and '[t]he burden is on the one attacking the [governmental action] to negative every conceivable basis which might support it,' ... whether or not the basis has a foundation in the record." *Heller v. Doe by Doe,* 509 U.S. 312, 320–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citations omitted).

This Court held, in *Spencer v. Jackson–Madison County Gen. Hosp.,* that the procedures put in place by JMCGHD

> regarding the granting and limiting of privileges to physicians are intended to maintain the quality of medical care provided to its patients.... This constitutes a legitimate interest. *See Darlak v. Bobear,* 814 F.2d 1055, 1063 (5th Cir.1987). Because JMCGHD has a legitimate interest in protecting the public from unqualified medical practitioners, *see Mitchell v. Clayton,* 995 F.2d 772, 774 (7th Cir.1993), the procedures adopted by JMCGHD to investigate complaints

against physicians and to take corrective action, if appropriate, are rationally related to the furtherance of this objective. Therefore, Defendants did not violate the rights guaranteed to Plaintiff by the Equal Protection Clause of the Fourteenth Amendment.

No. 97–1165, slip op. at 33. The same reasoning applies in this case. Therefore, the Court concludes that the Defendants did not violate Plaintiff's rights under the Equal Protection Clause.

2. *Procedural Due Process*

Plaintiff has alleged that the Defendants' actions violated his rights to both procedural due process and substantive due process. Under the Fourteenth Amendment, the state may not deprive an individual of life, liberty, or property without due process of law. A procedural due process violation cannot succeed unless the plaintiff first demonstrates that he has a protected liberty or property interest at stake. *Marler v. State Board of Optometry,* 102 F.3d 1453, 1456 (8th Cir.1996) (citing *Batra v. Bd. of Regents of Univ. of Neb.,* 79 F.3d 717, 720 (8th Cir.1996)). Once a liberty or property interest in shown, then the plaintiff must prove that he was deprived of such an interest without due process of law. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). "The fundamental requirement of [procedural] due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)).

Plaintiff's argument regarding the alleged deprivation of procedural due process is far from clear, as he conflates the issues of procedural and substantive due

process. However, for purposes of their motion, the Defendants have assumed that, for purposes of procedural due process, Plaintiff has a property interest in his PVI privileges, but does not have a liberty interest in those privileges.

This Court held, in *Spencer*, that a physician such as Plaintiff does not have a liberty interest in his clinical privileges:

> The restriction of Plaintiff's privileges did not result in the deprivation of a liberty interest. *See, e.g., Illinois Psychological Association v. Falk,* 818 F.2d 1337, 1343–44 (7th Cir.1987) (holding that removal of psychologists from hospital medical staffs is, at most, a curtailment of their occupational freedom and not a deprivation of occupational liberty.) "The concept of liberty protected by the due process clause has long included occupational liberty—'the liberty to follow a trade, profession, or other calling.'" *Wroblewski v. City of Washburn,* 965 F.2d 452, 455 (7th Cir.1992) (citing *Lawson v. Sheriff of Tippecanoe County,* 725 F.2d 1136, 1138 (7th Cir. 1984)). The cases have consistently drawn a distinction between occupational liberty and the right to hold a specific job. The due process clause secures the liberty to pursue a calling or occupation and not the right to a specific job. *Wroblewski,* 965 F.2d at 455....

*Spencer,* No. 97–1165, slip op. at 28 n. 12. There is no justification for refusing to apply that holding to this case. Therefore, for purposes of procedural due process, the Court concludes that Plaintiff does not have a liberty interest in his PVI privileges.

As indicated, the Defendants have assumed, for the purpose of procedural due process only, that Plaintiff had a protected property interest in his PVI privileges. Thus, he must establish that he was deprived of that interest without due process of law.

The Medical Staff Bylaws give the MEC "primary authority over the functions related to the Medical Staff and performance improvement activities regarding the professional services provided by individuals with clinical privileges." (Defs.' Ex. GG, Bylaws § 6.1.2(a).) The MEC is responsible for making recommendations to the Board of Trustees for its approval.

Such recommendations pertain to at least the following:

i. the Medical Staff's structure;

ii. the mechanism used to review credentials and to delineate individual clinical privileges;

iii. recommendations of individuals for medical staff appointment;

iv. recommendations for delineated clinical privileges for each eligible individual;

v. participation of the Medical Staff in Hospital performance improvement activities;

vi. the mechanism by which Medical Staff appointment may be terminated; and

vii. hearing procedures.

*Id.* at § 6.1.2(c). The MEC is authorized to appoint committees to perform performance improvement functions involving the medical staff. *Id.* at § 6.3. These performance improvement functions include evaluation of the "medical assessment and treatment of patients; ... use of operative and other procedures; efficiency of clinical practice patterns; and significant departures from established patterns of clinical practice." *Id.* at § 6.3(a), (d)-(f). The MEC is also authorized to "receive [ ] and act[ ] on reports and recommendations" from those committees. *Id.* at § 6.1.2(d).

Pursuant to JMCGHD's Credentialing Policy, concerns or questions about the clinical competence or practice of a member of the medical staff may be referred to the MEC (Defs.' Ex. HH, § 4.B(1)), which

may then elect to pursue an investigation, *id.* at § 4.C(1). The MEC may investigate the matter itself, request the Credentials Committee to investigate, or appoint an ad hoc investigating committee consisting of three individuals who are not partners, associates or relatives of the person being investigated. *Id.* at § 4.D(2). An investigating committee is specifically authorized to "use outside consultants, if needed." *Id.* at § 4.D(3). The person being investigated must be given the opportunity to meet with the investigating committee before it makes its report. *Id.* at § 4.D(4). Once the investigation is complete, the investigating committee will then make a report and recommendation to the MEC, which "may accept, modify, or reject the recommendation it receives from that committee." *Id.* at § 4.D.(4)-(5). Specifically, the MEC may:

(a) determine that no action is justified;

(b) issue a written letter of guidance;

(c) issue a letter of warning or reprimand;

(d) impose conditions for continued appointment;

(e) impose a requirement for consultation;

(f) recommend reduction of clinical privileges;

(g) recommend suspension of clinical privileges for a term;

(h) recommend revocation of staff appointment; or

(i) make such other recommendations as it deems necessary or appropriate.

*Id.* § 4.E(1)(a)-(i).

If the MEC recommends certain actions, such as suspension of clinical privileges, the individual is entitled to request a hearing. (Defs.' Ex. II, Hrg. & App. Proc. § 1.1(a)(7).) The CEO must notify the individual of that right via certified mail. *Id.* at § 2.1. If a hearing is requested, the CEO shall appoint a Hearing Panel of three persons composed of medical staff who did not participate in the matter at any previous level, or of physicians or laypersons unconnected with the Hospital; the panel shall not include anyone in the same specialty in direct economic competition with the individual under investigation. *Id.* at § 2.5(a)(1)-(2).

At the hearing, both sides shall be permitted to call and examine witnesses; introduce exhibits, cross-examine witnesses; be represented by counsel; and submit a written statement at the close of the hearing. The Hearing Panel may also question the witnesses and/or request the presence of additional witnesses or documentary evidence. *Id.* at § 3.5(a), (c). Within twenty days after final adjournment of the hearing, the Hearing Panel shall issue a written recommendation. *Id.* at § 4.3. The CEO shall immediately notify the affected individual of that written recommendation by certified mail. *Id.* at § 4.4.

Within ten days after notice of the Hearing Panel's recommendation, the individual may request an appeal. *Id.* at § 5.1. The Chairman of the Board shall then appoint a Review Panel of at least three persons, including no more than two members of the Board and also including reputable persons from outside the Hospital. *Id.* at § 5.4(a). Each party has the right to submit a written statement in support of its position, and the Review Panel may, in its sole discretion, allow oral argument. The Review Panel shall then make a final recommendation to the Board. *Id.* at § 5.4(c). The Board may, within thirty days, render a final decision affirming, modifying or reversing the recommendation of the Review Panel, may make its own *de novo* decision, or may refer the matter for further consideration. *Id.* at § 5.4(d), § 5.5. Unless the Board refers the matter for further consideration, its decision is final and effective immediately. *Id.* at § 5.6.

The United States Supreme Court has stated:

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See, e.g., Goldberg v. Kelly*, 397 U.S. [254], 263–271, 90 S.Ct. 1011, 25 L.Ed.2d 287 [(1970)].

*Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), *quoted in Sickles v. Campbell County, Ky.*, 501 F.3d 726, 730 (6th Cir.2007); *see also Moore v. Bd. of Educ. of Johnson City Sch.*, 134 F.3d 781, 785 (6th Cir.1998); *Firefighters United For Fairness v. City of Memphis*, 362 F.Supp.2d 963, 973 (W.D.Tenn.2005).

As to the first *Mathews* factor, Plaintiff's private interest in this case is his PVI privileges. That interest is significant; however, as the Defendants point out, the deprivation of that interest does not deprive him of his ability to make a living. Plaintiff retains his medical license and continues to practice medicine. "Admittedly, a physician would rather not be suspended from staff privileges even temporarily, but the affected physician may continue to practice medicine, albeit not at that hospital, and therefore is not deprived of his livelihood." *Darlak v. Bobear*, 814 F.2d at 1063.

The second *Mathews* factor is the risk of an erroneous deprivation of Plaintiff's interest through the procedures used and the probable value, if any, of additional or different procedures. In this case, JMCGHD's procedures involved multiple levels of consideration and review, by persons both from within the Hospital and from outside the Hospital. Plaintiff was given more than one opportunity to address the concerns raised. He was allowed to address both the Investigative Committee and the MEC, and was given a full and fair hearing at which he was allowed to present any evidence he deemed relevant to the issues.

Plaintiff contends that the procedures in this case were inadequate, depriving him of a meaningful opportunity to be heard. However, it is clear from his arguments, his own affidavit, and the additional evidence he has offered, that Plaintiff's real assertion is that the PVI Subcommittee intentionally and maliciously presented false and misleading information in a concerted effort to revoke his privileges. Thus, his concern is not the procedures themselves, but the ultimate decision that was reached. He has offered nothing to suggest that piling on additional or different procedures would have produced a better, or even a different, result.[21]

---

**21.** Plaintiff alleges that AMF did not follow its own guidelines and "ordinary peer review practice" in certain respects. (Compl.¶ 186.) However, neither "ordinary peer review practice" nor AMF's internal guidelines are relevant to his procedural due process claim. Rather, JMCGHD's own peer review process and procedures are at issue.

Plaintiff also alleges that the AMF Report was not properly authorized. *Id.* ¶ 187.

However, the JMCGHD Credentialing Policy specifically provides that an investigating committee "shall have . . . the authority to use outside consultants, if needed." (Defs.' Ex. HH, Cred. Pol. § 4.D(e3).) Moreover, the MEC specifically authorized, by formal resolution, the Investigative Committee in this case to use outside consultants. (Defs.' Ex. L, Mins. 10/14/02 Mtg.)

Finally, the state interest is JMCGHD's "legitimate interest, through continuing supervision, in maintaining the quality of medical care" provided to its patients. *Id.* (quoting *Daly v. Sprague,* 742 F.2d 896, 899 (5th Cir.1984)). Balancing this important interest with Plaintiff's interest in his PVI privileges, in light of the procedures used, the Court finds that there are no material facts in dispute on the issue of procedural due process. The process used in this case did not violate the Procedural Due Clause.

### a. *Stigma–Plus Doctrine*

■ Plaintiff also alleges that his interest in his PVI privileges is a protected interest under the Due Process Clause "because of the stigma and adverse effect that the revocation of the PVI privileges will have on Dr. Deming's professional reputation." (Compl. ¶ 179.) This "stigma plus" doctrine "involves an injury to one's reputation (the stigma) coupled with the deprivation of some tangible interest or property right (the plus), without adequate process." *Segal v. City of New York,* 459 F.3d 207, 212 (2nd Cir.2006).

■ Stigma plus "is a species within the phylum of procedural due process claims" and thus requires Plaintiff to prove not only a deprivation of a protected interest, but also that the deprivation was without due process of law. *Id.* at 213. "Stated differently, the availability of adequate process defeats a stigma-plus claim." *Id.* Assuming, for the sake of argument, that Plaintiff was deprived of a protected interest,[22] he is then entitled to a name-clearing hearing. *Quinn v. Shirey,* 293 F.3d at 320. As Plaintiff was given such a hearing in this case, his stigma plus claim also fails.

### 3. *Substantive Due Process*

In *Spencer,* this Court reviewed the basic principles of substantive due process law:

"Substantive due process ... protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." *Gutzwiller v. Fenik,* 860 F.2d 1317, 1328 (6th Cir.1988). The rights "protected by substantive due process arise from the Constitution itself and have been defined as those rights which are 'implicit in the concept of ordered liberty.'" *Id; see also Valot v. Southeast Local School District Board of Education,* 107 F.3d 1220, 1232 (6th Cir.1997) (Ryan, J. concurring) (quoting *Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)) ("[s]ubstantive due process protections 'have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.'")

No. 97–1165, slip op. at 34–35. The Court further noted:

"The Supreme Court 'has always been reluctant to expand the concept of substantive due process,' guideposts in this un-charted area being 'scarce and open-ended.'" *Lewellen v. Metropolitan Government of Nashville and Davidson County,* 34 F.3d 345, 351 (6th Cir.1994) (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 1070, 117 L.Ed.2d 261 (1992)); *see also Harrah Independent School District v. Martin,* 440 U.S. 194, 198, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979) (the Court noted that interests entitled to substantive due

---

**22.** The Sixth Circuit has held that "a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance." *Ludwig v. Bd. of Trustees of Ferris State Univ.,* 123 F.3d 404, 410 (6th Cir.1997), *quoted in Quinn v. Shirey,* 293 F.3d 315, 320 (6th Cir.2002). That is the case here.

process protection involve an "individual's freedom of choice with respect to certain basic matters of procreation, marriage, and family life.")....

*Id.* at 35.

Plaintiff's claim that the Defendants violated his right to substantive due process is based on his allegations that the peer review process in this case was "unreasonable, arbitrary, capricious, or discriminatory." (Compl.¶ 182.) He contends that JMCGHD's Bylaws and other rules and regulations created a contractual right to a peer review process conducted in good faith. Plaintiff further argues that the Defendants deliberately and maliciously used false statements and misleading information in order to revoke his PVI privileges to protect their own economic interests.

As discussed in the context of procedural due process, *supra,* Plaintiff also has no liberty interest in his PVI privileges that is protected by substantive due process. He has not been deprived of the ability to practice medicine in Tennessee or anywhere else; he lost clinical PVI privileges only at JMCGHD. *See Parate v. Isibor,* 868 F.2d 821, 831–32 (6th Cir.1989) (professor terminated from one university was not deprived of a liberty interest in the free and full pursuit of his profession).

While the Court assumed that Plaintiff had a property interest in his PVI privileges that was protected by procedural due process, that interest is derived solely from JMCGHD's Bylaws, Credentialing Policy or Hearing and Appeal Procedures; *i.e.,* it is state-created. Such state-created contractual employment rights generally are not "fundamental" interests that are protected under substantive due process:

> Most, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by substantive due process. The substantive Due Process Clause is not con-

cerned with the garden variety issues of common law contract. Its concerns are far narrower, but at the same time, far more important. Substantive due process "affords only those protections 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" ...

> State-created rights such as [the plaintiff's] contractual right to promotion do not rise to the level of "fundamental" interests protected by substantive due process. Routine state-created contractual rights are not "deeply rooted in this Nation's history and tradition," and, although important, are not so vital that "neither liberty nor justice would exist if [they] were sacrificed." ...

> In the present case, we do not believe liberty and justice are threatened, in the constitutional sense, by the failure of the government and its officials to abide by their contract....

*Charles v. Baesler,* 910 F.2d 1349, 1353 (6th Cir.1990) (citations omitted). *See also Valot v. Southeast Local Sch. Dist. Bd. of Educ.,* 107 F.3d at 1233 (Ryan, J. concurring) (state-created rights are not fundamental rights protected by substantive due process because fundamental rights are created only by the Constitution); *Sutton v. Cleveland Bd. of Educ.,* 958 F.2d 1339, 1350–51 (6th Cir.1992) (state-created right to tenured employment not protected by substantive due process, even though employment contract provided employee could only be discharged for just cause); *Holthaus v. Board of Education Cincinnati Public Schools,* 986 F.2d 1044, 1046 (6th Cir.1993) (termination of teacher's employment contract could not be a violation of substantive due process).

Plaintiff has submitted the affidavits of several physicians which contain conclusory statements that Plaintiff is an excellent physician and recommendations that his

PVI privileges be reinstated, statements of opinion disagreeing with the Defendants' conclusions regarding Plaintiff's clinical performance, and statements of belief that the peer review process was unfair.[23] Plaintiff's own affidavit, which is sixty-two pages long, contains glowing descriptions of his own medical skills and exemplary record, his views of the "turf war" between cardiologists and radiologists, descriptions of the relevant medical procedures, his opinions and perceptions about the motivations of the PVI Subcommittee and the MEC, lengthy and detailed case-by-case information regarding the perceived deficiencies in the AMF Report, legal arguments and conclusions, and a litany of other supposed injustices. (Pl.'s Aff., D.E. # 91–2.)

■ When all the irrelevant information is sifted out, what is left is Plaintiff's belief that the Defendants—negligently, at best, and intentionally, at worst—reached the wrong conclusion when they revoked his PVI privileges. This dispute simply does not involve any fundamental constitutional right that is deserving of substantive due process protection. The Court does "not believe liberty and justice are threatened, in the constitutional sense," by the Defendants alleged actions. Therefore, Plaintiff's right to substantive due process was not violated.

As Plaintiff has failed to establish that his constitutional rights were violated, the Defendants are entitled to judgment as a matter of law on his claims under § 1983.

*Waiver of Liability As To All Legal Claims*

Lastly, Defendants argue that all legal claims against them were waived when

Plaintiff applied for appointment to the JMCGHD medical staff.

Pursuant to the JMCGHD Credentialing Policy, by applying for appointment or reappointment to the JMCGHD medical staff, the applicant agrees "to abide by all Bylaws, Policies, and Rules and Regulations of the Medical Staff, Board, and the Hospital in effect during the time the individual is appointed to the Medical Staff...." Cred. Pol., § 2.B.2(b). In addition, § 2.B.3 of the Credentialing Policy provides:

By applying for appointment, reappointment, or clinical privileges, the applicant expressly accepts these conditions during the processing and consideration of the application, whether or not appointment or clinical privileges are granted, and during the time of any appointment or reappointment.

(a) To the fullest extent permitted by law, the applicant extends immunity to, releases from any and all liability and agrees not to sue (except for actions arising out of activities outside the scope of their duties and responsibilities):

(1) the Hospital;

(2) any authorized representatives of the Hospital; and

(3) any third party providing information to or receiving information from them for any actions or communications relating to the application(s) or any other professional review activity.

(b) The applicant authorizes the Hospital:

(1) to consult with third parties regarding the applicant's clinical

---

**23.** These affidavits include those of Murty Narapareddy, M.D., Susan Alex, M.D., Ram Chary, M.D., Larry Carruth, M.D., James Carruth, M.D. and Robert Winston, M.D. (Pl.'s Exs. 2–7, D.E. # 90–4–# 90–9.) As previously discussed, Dr. Weinstein's affidavit contains similar statements, but also details what he believes are deficiencies in the AMF Report. (Pl.'s Ex. 1, D.E. # 90–3.)

competence, professional conduct, character, ethics, behavior, or other matter bearing on qualifications or ability to perform the functions of medical staff appointment and clinical privileges, and

(2) to obtain all documents, recommendations, reports or other information relating to such matters.

(c) The term "authorized representatives" means any persons who have any responsibility for obtaining or evaluating credentials, acting upon applications or conducting professional review activity, including Board members, employees, Medical Staff or committee members, consultants and attorneys.

(d) The term "third parties" means including, but not limited to, other hospitals, health care facilities, government agencies, former employers, insurers, and managed care plans.

(e) The term "professional review activity" means any action or communication by the Hospital or its authorized representatives related to any:

(1) determination on applications for clinical privileges or appointment;

(2) determination related to the scope or conditions or appointment and/or privileges;

(3) modification, suspension or termination; or

(4) review or recommendation of clinical competence or professional conduct.

(f) The applicant agrees that the hearing and appeal procedures set forth in this Policy shall be the sole and exclusive remedy with respect to any professional review action taken at this Hospital. If the individual institutes legal action and does not prevail, he or she shall reimburse the Hospital and any Medical Staff members named in the action for all costs incurred in defending such legal action, including reasonable attorney's fees.

█ Plaintiff last applied for reappointment to the medical staff on October 17, 2003. (Defs.' Ex. RR, Reappt. Application.) By signing the application, Plaintiff acknowledged that he had received and had an opportunity to read the "bylaws, rule and regulations of the medical staff . . . and agree to be bound by the terms thereof. . . ." *Id.* at 6. Plaintiff also agreed, by signing the application, to subject his clinical performance to JMCGHD's quality assurance programs, and further agreed "to hold members of the medical staff and other authorized representatives of [JMCGHD] or the affiliated facilities of [WTH] engaged in these quality activities free of all liability for their actions performed in good faith in connection therewith." *Id.* at 7.

In opposition to Defendants' waiver argument, Plaintiff seizes on the phrase in § 2.B.3(a) of the Credentialing Policy providing that the waiver of liability does not apply to "actions arising out of activities outside the scope of their duties and responsibilities." He contends that there is a genuine issue of material fact regarding whether the Defendants failed to provide him with a reasonable peer review, *i.e.*, whether the revocation of his PVI privileges "was warranted under the standards set forth under JMCGH—Hearing and Appeal Procedures, Section 5.2." [24] (Pl.'s

---

24. Section 5.2 of the Hearing and Appeal Procedures provides three grounds for appeal of a Hearing Panel Report:

(a) there was substantial failure to comply with this policy, and/or the Board or Medical Staff Bylaws during or prior to the

Resp. at 52.) He further contends that if the revocation of his privileges was unwarranted, this takes Defendants' activities outside the scope of their duties and responsibilities.

Were the Court to accept Plaintiff's definition of activities arising outside the scope of Defendants' duties and responsibilities, then the exception would swallow the rule. A physician would be able to avoid the waiver of liability and sue in court every time there was a legitimate ground for appeal under § 5.2 of the Hearing and Appeal Procedures. This clearly is not the meaning or the intent of § 2.B.3 (a) of the Credentialing Policy. Plaintiff has offered no evidence that the activities of the Defendants in revoking Plaintiff's PVI privileges were not taken within the scope of their duties and responsibilities, as described in §§ 4.A–4.E of the Credentialing Policy. (Defs.' Ex. HH at 48–52.)[25] Plaintiff's allegations that his hearing was inadequate are insufficient to create a genuine issue of material fact on this question.

Plaintiff also contends that the waiver of liability does not apply to his constitutional claims. However, he concedes that a waiver of individual constitutional rights is permissible under certain circumstances, citing *Fuentes v. Shevin*, 407 U.S. 67, 95, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Such a waiver is valid if the surrounding facts and circumstances make it clear that it was done voluntarily, knowingly, and intelligently, with a complete understanding of the consequences of the waiver. *See, e.g., Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)

(recognizing that the constitutional right to a jury trial in a criminal case may be waived); *Leonard v. Clark*, 12 F.3d 885, 889–90 (9th Cir.1993) (contractual waiver of First Amendment rights). That standard is satisfied here. The waiver provision clearly applies to all liability, providing that an applicant for reappointment to the medical staff: "To the fullest extent permitted by law extends immunity to, releases from *any and all liability* and *agrees not to sue ....*" In his application for reappointment, Plaintiff acknowledged that he had an opportunity to read this and all other provisions of the Medical Staff Bylaws, *rules and regulations*, and agreed to be bound by them. He has offered no evidence that he did not understand the consequences of the waiver.

The Court finds that the Defendants are entitled to judgment as a matter of law on the grounds that Plaintiffs have waived all claims against them based on his application for reappointment to the medical staff.

### Conclusion

For all of the foregoing reasons, the Court finds that the Defendants are entitled to judgment as a matter of law on all of Plaintiff's claims. Therefore, Defendants' motion to dismiss and/or for summary judgment (D.E.# 47) is hereby GRANTED. The Clerk is directed to prepare a judgment.

IT IS SO ORDERED.

hearing, so as to deny a fair hearing; and/or

(b) the recommendations of the Hearing Panel were made arbitrarily, capriciously, or with prejudice; and/or

(c) the recommendations of the Hearing Panel were not supported by substantial evidence.

Plaintiff appealed the Hearing Panel Report in his case on all three grounds. (Defs.' Ex. LL, letter from A. Pietrangelo.)

**25.** Article 4 of the Credentialing Policy sets out the procedure for investigating concerns that may arise regarding a physician's clinical practice and for taking adverse action based on those concerns.